679 A.2d 634

IN THE MATTER OF D.C.

Argued April 29, 1996—Decided August 6, 1996.

*Jaynee LaVecchia*, Assistant Attorney General, argued the cause for appellant, State of New Jersey, (*Deborah T. Poritz*, Attorney General of New Jersey, attorney; *Ms. LaVecchia, Joseph L. Yannotti* and *Benjamin Clarke*, Assistant Attorneys General, of counsel; *Mr. Clarke, Daisy B. Barreto* and *John K. Worthington*, Deputy Attorneys General, on the briefs).

*Vincent W. Basile* argued the cause for respondent, D.C. (*Flood & Basile*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This appeal arises from the involuntary civil commitment of D.C. After pleading guilty to sexual assault, kidnapping, and weapon possession charges, D.C. was convicted and sentenced to the Avenel Diagnostic and Treatment Center. Finding D.C. was not mentally ill under the statute authorizing involuntary commitment and not committable, the prison medical staff authorized his release.

D.C. was thereafter subjected to surveillance by local law enforcement authorities in the community. On learning of the reported results of that monitoring, the Attorney General sought and obtained court authorization to compel D.C. to submit to psychiatric evaluations to determine whether he should be required to undergo civil involuntary commitment proceedings.

Thereafter, following a hearing, the court found D.C. to be suffering from "mental illness" and "dangerousness" and ordered him temporarily confined to Bergen Pines Community Hospital to undergo psychiatric examination. Subsequent commitment proceedings resulted in the continuing involuntary commitment of D.C. to a state mental hospital.

It is not disputed that the proceeding that resulted in D.C.'s initial temporary involuntary confinement at the request of the Attorney General for purposes of being subjected to a psychiatric examination did not comply with the statutory procedural requirements governing the involuntary commitment of mentally ill persons and was not expressly authorized by any statute or rule of court.

This appeal challenges the constitutional and statutory validity of D.C.'s involuntary commitment and, particularly, the authority

of the Attorney General to initiate and participate in commitment proceedings.

I

On July 12, 1980, D.C. abducted a young woman, took her to a wooded area, tied her to a tree, and gagged her. He retrieved a "torture kit," which included medical instruments, rope, and a pick ax, and proceeded to torture and rape his victim. D.C. stated that he spared the victim's life when he saw blood coming from her rectum. D.C. turned himself in to authorities and pled guilty to aggravated sexual assault, kidnapping, and possession of a knife. He was sentenced to the Avenel Diagnostic and Treatment Center (ADTC or Avenel) for two concurrent twenty-year terms with a ten-year period of parole ineligibility.

At ADTC, D.C. was placed in therapy; tests indicated that he was unable to control his thoughts or behavior and had inadequate control over his impulses. Dr. Kay Jackson, a staff psychologist at Avenel, began treating D.C. in January 1992. D.C. reported to Jackson that he continued to have violent sexual fantasies and if released would commit the same kind of crime he committed in the past. He stated that he considered himself a "failed rapist because his victims are alive" and that he would "attempt to kill the next victim."

Jackson found that D.C.'s condition had remained unchanged. In April 1992 and November 1992, she asked psychiatrists at ADTC to examine D.C. for possible involuntary civil commitment. The doctors agreed with Jackson that D.C. was potentially dangerous and would commit a sexual offense again, but concluded he was not eligible for involuntary commitment because he was not "openly psychotic."

D.C. was released from Avenel on November 17, 1992, after serving twelve years. After his release, Dr. Jackson contacted law enforcement authorities of Wyckoff Township, the Bergen County community where he intended to resume residence, to warn them that in her opinion D.C. was dangerous and presented

a harm to the public. Jackson also spoke with the Bergen County Prosecutor.

Shortly after his release from Avenel, D.C. voluntarily submitted to an evaluation by Dr. Joel Fetterbush, a psychiatrist for the Mid–Bergen Mental Health Center, Inc., the screening service located at Bergen Pines Hospital. He found D.C. not mentally ill.

The Wyckoff Police and the Bergen County Prosecutor's Office conducted a close surveillance of D.C. They observed D.C., who knew he was under surveillance, engaging in various types of peculiar behavior. Members of the surveillance teams explained that D.C. would tell them that he was a rapist and always will be, likening his condition to that of an alcoholic; he expressed continued interest in younger girls, saying they understand him better. D.C. admitted to them that he wanted to contact the victim of the 1980 assault to "see if she [was] okay." The surveilling officers also noted that D.C. would at times shout profanities and threatening remarks. D.C. also attempted to explain his strange conduct to the officers.

The Attorney General investigated the circumstances surrounding D.C.'s release from Avenel. He concluded that ADTC's staff had applied an incorrect standard in authorizing D.C.'s release. (He apparently was also denied access to the psychiatric records of the Bergen County screening service, and therefore believed that evaluation could not be relied on.) The Attorney General obtained an order to show cause from the Superior Court of New Jersey, Law Division, Bergen County, seeking a psychiatric examination of D.C. to determine whether involuntary commitment proceedings against him should be initiated. On January 8, 1993, the court ordered that the records be sealed and that the proceedings be closed.

A hearing on the order to show cause was held on January 13, 1993. The court determined that although the statute and court rules did not authorize the Attorney General's application, the Attorney General was acting in her capacity as *parens patriae.* Weighing all of the relevant factors, the court granted the relief

sought by the Attorney General and ordered the psychiatric examinations of D.C.

The psychiatric examinations were conducted on January 21, 1993. The court thereafter held a hearing to determine whether probable cause existed to believe that D.C. was in need of involuntary commitment. The court found probable cause existed and ordered D.C. temporarily committed to Bergen Pines County Hospital pending a plenary commitment hearing. That hearing was conducted on February 8, 1993, in which four physicians who had conducted the evaluations of D.C. testified. On February 19, 1993, the trial court found that D.C. was in need of involuntary commitment. D.C. was thereafter transferred to the Forensic Hospital in Trenton.

In June 1993, D.C.'s commitment was reviewed. The court, on July 1, 1993, ordered his continued confinement, concluding that D.C. was mentally ill and dangerous. A second review hearing was conducted in the winter of 1994. The trial court, in March 1994, determined that D.C.'s commitment should be continued.

D.C. appealed the February 1993 commitment decision and the July 1993 decision for continued commitment. D.C. filed a second appeal of the March 1994 commitment decision.

A divided Appellate Division reversed the decision of the trial court that ordered D.C.'s initial temporary involuntary commitment. 281 *N.J.Super.* 102, 656 *A.*2d 861 (App.Div.1995). It determined that D.C.'s initial confinement based on the Attorney General's request for a psychiatric examination was not authorized by statute or under the State's inherent *parens patriae* powers, and that D.C.'s subsequent commitments did not conform to the procedural requirements of the civil commitment statute. *Id.* at 120, 656 *A.*2d 861. The court further concluded that because the physicians at the Bergen County screening facility had, prior to the Attorney General's initial application, determined that D.C. failed to fall within the definition of mental illness applicable at the time and was not committable, the trial court should have ordered D.C.'s release. 281 *N.J.Super.* at 121, 656 *A.*2d 861.

Due to the dissent in the Appellate Division, this appeal is before us as of right. *R.* 2:2–1(a)(2).

## II

D.C. challenges the authority of the Attorney General to initiate proceedings for his temporary involuntary commitment. That challenge requires an examination of the comprehensive statutory and the regulatory standards that govern involuntary commitments.

### A.

In 1987, the Legislature passed a comprehensive civil commitment statute. *L.* 1987, *c.* 116 §§ 1–33 (codified at *N.J.S.A.* 30:4–27.1 to –27.23). Central to the commitment statute is the Legislature's express directive that each county or designated mental health service area develop a screening service or short term care facility to meet the needs for evaluation and treatment of mentally ill persons. *N.J.S.A.* 30:4–27.1d. The statute carefully prescribed the procedures for involuntary civil commitment. Pursuant to *N.J.S.A.* 30:4–27.10:

a. A short term care or psychiatric facility or a special psychiatric hospital shall initiate court proceedings for involuntary commitment by submitting to the court a clinical certificate completed by a psychiatrist on the patient's treatment team and the screening certificate which authorized admission of the patient to the facility; provided however, that both certificates shall not be signed by the same psychiatrist unless the psychiatrist has made a reasonable but unsuccessful attempt to have another psychiatrist conduct the evaluation and execute the certificate.

b. Court proceedings for the involuntary commitment of any person not referred by a screening service may be initiated by the submission to the court of two clinical certificates, at least one of which is prepared by a psychiatrist. The person shall not be involuntarily committed before the court issues a temporary court order.

The Act provided several relevant statutory definitions. *See N.J.S.A.* 30:4–27.2. It defined mental illness to mean:

a current, substantial disturbance of thought, mood, perception, or orientation which significantly impairs judgment, behavior or capacity to recognize reality, but does not include simple alcohol intoxication, transitory reaction to drug ingestion,

organic brain syndrome, or developmental disability unless it results in the severity of impairment described herein.

[*N.J.S.A.* 30:4–27.2r].

"Dangerous to others or property" is defined to mean "that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act or threat." *N.J.S.A.* 30:4–27.2i. The Act also defines "dangerous to self." *N.J.S.A.* 30:4–27.2h.

Legislative findings and declarations stated that the State is responsible for providing care, treatment, and services to mentally ill persons who cannot care for themselves, or who are dangerous to themselves, others, or property. *N.J.S.A.* 30:4–27.1a. The Legislature further explained:

> Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior, and therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others, or to property, are involuntarily committed.
> [*N.J.S.A.* 30:4–27.1b].

The goal of the legislation was to create a public health system that provides professional treatment and services in a manner that "protects individual liberty and provides advocacy and due process for persons receiving treatment." *N.J.S.A.* 30:4–27.1c.

The New Jersey Rules of Court also address civil commitments. *Rule* 4:74–7, entitled "Civil Commitment," adopts the definitions found in *N.J.S.A.* 30:4–27.2. *R.* 4:74–7(a). Like *N.J.S.A.* 30:4–27.10, *Rule* 4:74–7 identifies and implements two methods of commencing an action for involuntary civil commitment: screening service referral or independent applications that require two clinical certificates, one from a psychiatrist, recommending involuntary commitment. *R.* 4:74–7(1) and (2). The rule provides that if probable cause exists after the presentation of the two clinical certificates in conformance with that standard, the court may

enter an order of temporary commitment pending a full commitment hearing. *R.* 4:74–7(c). The rule also authorizes "discovery." *R.* 4:74–7(d) ("[T]he court may also order testing or examination of the patient by an independent psychiatrist, psychologist or other expert").

The history of the Court Rule notes that the rule "was clearly required in order to correct a long standing history of procedural abuses in the civil commitment process and to ensure that no person may be involuntarily committed to a psychiatric institution without having been afforded full procedural due process." Pressler, *Current N.J. Court Rules,* comment 1, on *R.* 4:74–7 (1995). *See In re N.N.,* 146 *N.J.* 112, 119, 679 *A.*2d 1174 (1996). The commentary observes that the adoption of the rule reflects an increasing concern for the mentally ill and a "growing realization that, traditionally, persons alleged to be suffering from mental illness have been committed on ex parte orders entered without representation by counsel, without adequate notice, without adequate proofs and in general violation of the most fundamental concepts of due process." Pressler, *Current N.J. Court Rules,* comment 1, on *R.* 4:74–7 (1995). The commentary acknowledges that the rule was revised to conform with *N.J.S.A.* 30:4–27.1 to – 27.23. *Ibid.* Specifically, referring to the provision entitled "Discovery," the comment cites the Appellate Division opinion in this case, and observes that "the provisions of this rule have been held applicable only to pending commitment proceedings properly commenced pursuant to paragraph (b)." Pressler, *Current N.J. Court Rules,* comment 5, on *R.* 4:74–7(d) (1995).

In 1994, the Legislature amended the civil commitment statute. *L.* 1994, *c.* 134. The amendments added language to the definition of mental illness. After the enactment of the amendment, the definition of mental illness provided:

Mental illness means a current, substantial disturbance of thought, mood, perception, or orientation which significantly impairs judgment, *capacity to control* behavior or capacity to recognize reality, but does not include simple alcohol intoxication, transitory reaction to drug ingestion, organic brain syndrome, or developmental disability unless it results in the severity of impairment described

herein. *The term mental illness is not limited to "psychosis" or "active psychosis," but shall include all conditions that result in the severity of impairment described herein.*

[*N.J.S.A.* 30:4–27.2r (amendatory provision emphasized).]

The 1994 amendments added section d to *N.J.S.A.* 30:4–27.10.

d. The Attorney General, in exercise of the State's authority as parens patriae, may initiate a court proceeding for the involuntary commitment of any person in accordance with the procedures set forth in subsection a. or b. of this section. When the Attorney General determines that the public safety requires initiation of a proceeding pursuant to subsection b. of this section, the Attorney General may apply to the court for an order compelling the psychiatric evaluation of the person. The court shall grant the Attorney General's application if the court finds that there is reasonable cause to believe that the person may be in need of involuntary commitment. The Attorney General may delegate the authority granted pursuant to this subsection, on a case by case basis, to the county prosecutor.

The 1994 amendments explicitly authorize the Attorney General to participate in involuntary commitment proceedings.

(1) The Attorney General, or the county prosecutor acting at the request of the Attorney General, may supersede the county counsel or county adjuster and assume responsibility for presenting any case for involuntary commitment or may elect to participate with the county counsel or county adjuster in presenting any such case.

[*N.J.S.A.* 30:4–27.12c(1).]

Furthermore, *N.J.S.A.* 30:4–27.13a now states that the Attorney General may provide notice to appropriate parties if presenting the case for the patient's involuntary civil commitment. Finally, *N.J.S.A.* 30:4–27.13b currently provides that not only could the members of the patient's treatment team testify, but "any other witness with relevant information offered by the patient or the persons presenting the case for civil commitment shall also be permitted to testify."

The Legislature expressed its understanding of the nature of the powers conferred on the Attorney General. It noted in a statement connected with the amendments, that the bill "would codify what is inherent in the Attorney General's common law responsibility to act on behalf of the State, as parens patriae—a grant of authority to seek civil commitment when the public safety requires." *Sponsor Statement to Assembly Bill No. 86,* at 1 (Sept. 26, 1994) (hereinafter *"Sponsor Statement"*).

In adopting these amendments, the Legislature explained its purpose and intent as follows:

a. A small but dangerous group of sexual offenders and other violent offenders suffer from mental illness which rendered them dangerous to others and for the protection of the public they are in need of involuntary civil commitment for treatment.

b. The statutory standards for involuntary civil commitment define "mental illness" in terms of its impairment of judgement, behavior and capacity to recognize reality. The statutory standard provides for involuntary commitment when such mental illness causes the person to be dangerous to others or property. Recommendations concerning commitment are too often based in the presence or absence of psychosis.

c. To ensure the public is not denied the protection that the Legislature intended to provide in enacting a law that calls for involuntary civil commitment of the dangerous mentally ill, it is necessary to reaffirm and clarify the statutory standards for civil commitment and revise the procedures governing release of offenders and civil commitment in order to ensure that the full benefits of the civil commitment law are realized.

[*L.* 1994, *c.* 134, § 1.]

### B.

The Appellate Division sharply disagreed over whether the proceedings that were initiated by the Attorney General to determine if D.C. should be involuntarily committed were valid in light of the statutory and regulatory scheme governing involuntary civil commitments. Those points of disagreement crystallize the issues that must be addressed on this appeal.

The Appellate Division majority determined that the 1987 civil commitment statute governed the proceedings that resulted in D.C.'s involuntary commitment. 281 *N.J.Super.* at 116–118, 656 *A.*2d 861. It never considered whether the 1994 amendments could be applied retroactively. Relying on the pre-amendment provisions, the court explained that the Legislature, pursuant to *N.J.S.A.* 30:4–27.1b, "made it clear that involuntary commitment proceedings must strictly adhere to statutory safeguards." 281 *N.J.Super.* at 116, 656 *A.*2d 861.

The majority found that the civil commitment statute provides only two procedures for commencing an involuntary civil commit-

ment. *Ibid.* A proceeding may be commenced by the recommendation of a mental health screening facility (*N.J.S.A.* 30:4–27.10a); or proceedings may be commenced by submission to the court of two clinical certificates, at least one of which is by a psychiatrist, recommending commitment (*N.J.S.A.* 30:4–27.10b). *Id.* at 116–17, 656 *A.*2d 861. The majority emphasized the importance of county-based public mental health screening facilities and that "screening service evaluation is the preferred process for entry into short-term care facilities" (citing *N.J.S.A.* 30:4–27.4). The majority added that pursuant to *N.J.S.A.* 30:4–27.6, even law enforcement officials must use a mental health screening facility after taking into custody a person believed to be in need of commitment. *Id.* at 117, 656 *A.*2d 861.

The majority concluded that "any deviation from these strict procedures cannot be countenanced." *Id.* at 118, 656 *A.*2d 861. The Attorney General, the court stated, must adhere to the directives of the Legislature by following statutory procedure. *Id.* at 119–20, 656 *A.*2d 861. The court ruled that the Attorney General should have directed law enforcement officials to take D.C. into custody and transport him to the Bergen County mental health screening facility for evaluation by a mental health screener. *Id.* at 119–20, 656 *A.*2d 861. The court also determined that the trial court did not have the authority to issue an order requiring D.C. to submit to two psychiatric examinations by private psychiatrists selected by the Attorney General. *Id.* at 120, 656 *A.*2d 861.

Judge Shebell in dissent strongly disagreed with the majority's conclusion that the Attorney General and the courts were "powerless to by-pass the faulty opinion of the institutional psychiatrists by obtaining independent psychiatric evaluations." *Id.* at 122, 656 *A.*2d 861. The dissent found no evidence to suggest that the Legislature prohibited any exceptions or deviations from the civil commitment proceedings. *Ibid.* The dissent concluded that: "In accordance with the State's *parens patriae* authority, the Attorney General and the court recognized their duty to protect the public

interest and have done so while scrupulously protecting D.C.'s due process rights." *Id.* at 123, 656 *A.*2d 861 (citations omitted).

## III

■ Two bases are put forward to validate the actions of the Attorney General. One is that those actions are valid under the *parens patriae* jurisdiction. The other is that the 1994 amendments apply retroactively and the Attorney General's actions comply with those amendatory provisions. In the context of this case and in light of the history of the 1994 amendments, these issues functionally overlap.

The 1994 amendments reflect the legislative intent to codify the Attorney General's *parens patriae* powers and explicitly provide for the exercise of those powers. The statutory amendment "codif[ies] ... the Attorney General's common law responsibility to act on behalf of the State, as *parens patriae* " in seeking civil commitment. *Sponsor Statement, supra,* at 1. It specifically authorizes the Attorney General to initiate involuntary commitment proceedings if that is required in the interests of "public safety." *N.J.S.A.* 30:4–27.10d. Because the 1994 amendments incorporate the common law *parens patriae* powers of the Attorney General, an explanation of the nature and extent of that source of authority is relevant to the interpretation and application of the 1994 amendments.

■ The authority of the state to effect involuntary commitment is derived from two sources: the police power and the *parens patriae* power. *Addington v. Texas,* 441 *U.S.* 418, 426, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.*2d 323, 331 (1979). "The authority of the State to civilly commit citizens is said to be an exercise of its police power to protect the citizenry and its *parens patriae* authority to act on behalf of those unable to act in their own best interests." *In re S.L.,* 94 *N.J.* 128, 136, 462 *A.*2d 1252 (1983) (citations omitted). *See In re N.N., supra,* 146 *N.J.* at 129, 679 *A.*2d 1174 (discussing the nature of the *parens patriae* authority). Under the *parens patriae* theory, the state draws on "the inherent

equitable authority of the sovereign to protect those persons within the state who cannot protect themselves because of an innate legal disability," such as minority, mental illness or incompetency. *In re Grady,* 85 *N.J.* 235, 259, 426 *A.*2d 467 (1981); *In re S.L., supra,* 94 *N.J.* at 136, 462 *A.*2d 1252.

Though "[t]he States have traditionally exercised broad power to commit persons found to be mentally ill," the United States Supreme Court has determined that states must adhere to certain procedures in order to commit involuntarily an individual. *Jackson v. Indiana,* 406 *U.S.* 715, 736, 92 *S.Ct.* 1845, 1857, 32 *L.Ed.*2d 435, 450 (1972); *see, e.g., Foucha v. Louisiana,* 504 *U.S.* 71, 80, 112 *S.Ct.* 1780, 1786, 118 *L.Ed.*2d 437, 448 (1992) (holding that states must prove by clear and convincing evidence that person to be committed is mentally ill and dangerous). "The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy." *In re S.L., supra,* 94 *N.J.* at 139, 462 *A.*2d 1252. *See In re N.N., supra,* 146 *N.J.* at 130, 679 *A.*2d 1174. "Because commitment effects a great restraint on individual liberty this power of the State is constitutionally bound," and its exercise must "comply with due process." *In re S.L.,* 94 *N.J.* at 137, 462 *A.*2d 1252 (citations omitted). Thus, a person subject to involuntary commitment is entitled to a judicial hearing, a right of notice, the right to present evidence, and the right to be represented by counsel. *Ibid.; see Addington v. Texas, supra,* 441 *U.S.* at 425–426, 99 *S.Ct.* at 1809, 60 *L.Ed.*2d at 330–33 (finding that civil commitment of incompetent requires clear and convincing standard of proof rather than mere preponderance of the evidence); *see also Foucha v. Louisiana, supra,* 504 *U.S.* at 80, 112 *S.Ct.* at 1786, 118 *L.Ed.*2d at 448 (same).

The Attorney General has long been vested with the responsibility of protecting the public interest and enforcing public duties by instituting appropriate civil actions in court. *See, e.g., Alexander v. New Jersey Power & Light Co.,* 21 *N.J.* 373, 380, 122 *A.*2d 339 (1956) (discussing inherent powers and responsibilities of

Attorney General); *In re Public Serv. Coor. Transport,* 5 *N.J.* 196, 209, 74 *A.*2d 580 (1950) (same); *Wilentz v. Hendrickson,* 133 *N.J. Eq.* 447, 454–455, 33 *A.*2d 366 (N.J.Ch.1943), *order aff'd,* 135 *N.J. Eq.* 244, 38 *A.*2d 199 (E. & A. 1944) (same). This Court has observed, however, that the State's *parens patriae* powers are not absolute. The State's common-law power to function as protector of the public interest is subject to either "enlargement or abridgment" by legislative authority. *See Alexander, supra,* 21 *N.J.* at 380, 122 *A.*2d 339. Moreover, the *parens patriae* authority must conform to procedural and substantive due process. *In re S.L., supra,* 94 *N.J.* at 139, 462 *A.*2d 1252; *In re Raymond S.,* 263 *N.J.Super.* 428, 431–432, 623 *A.*2d 249 (App.Div.1993). These constraints serve to prevent arbitrariness, unfairness, and potential abuse and to protect individual rights and interests.

The Appellate Division majority concluded that the civil commitment statute did not contemplate deviations from its procedural requirements. 281 *N.J.Super.* at 117, 656 *A.*2d 861. It stressed that the Legislature emphasized procedural due process throughout the statutory provisions. *Id.* at 116–17, 656 *A.*2d 861, citing *N.J.S.A.* 30:4–27.1(b) ("It is necessary that State law provide *clear standards and procedural safeguards* that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed"); *N.J.S.A.* 30:4–27.3 ("The *standards and procedures apply to all adults* involuntarily committed"); *N.J.S.A.* 30:4–27.11a(c) ("[I]t is necessary to *specify and guarantee by statute* those rights to which that patient is entitled") (emphasis added). It construed these legislative expressions as a clear directive that only the procedures delineated by the statute could be used in involuntary commitments.

The Appellate Division's conclusion that the 1987 commitment statute abridged the *parens patriae* powers of the Attorney General is countered by the Legislature's perception, expressed in the 1994 amendments, that those powers were not so limited. *See e.g., Sponsor Statement, supra,* at 1 (noting that the 1994 amendments "codify what is inherent in the Attorney General's common

law responsibility to act on behalf of the State, as parens patriae ... to seek civil commitment when the public safety requires.") In effect, the fundamental *parens patriae* powers have been expressly channelled into the civil commitment statute as amended. The amendments to the statutory scheme for involuntary commitments now expressly recognize and authorize the exercise of the State's *parens patriae* powers to protect the public welfare and to initiate civil commitment proceedings in the exercise of that power. *N.J.S.A.* 30:4–27.10d. Because the State's *parens patriae* authority is itself given a prominent place under the current amendments, it directly implicates the issue of the retroactive application of the amendments. That the Legislature perceived that the Attorney General acted lawfully in this matter bears most relevantly on whether the Legislature intended that the authority codified and conferred by the 1994 amendments be exercised retroactively. We, therefore, turn to that issue which, though not considered or resolved by the Appellate Division is most vigorously argued by the Attorney General before this Court.

It is well-settled that statutes generally should be given prospective application. *Gibbons v. Gibbons,* 86 *N.J.* 515, 521, 432 *A.*2d 80 (1981). "It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair." *Gibbons, supra,* 86 *N.J.* at 522, 432 *A.*2d 80. It is "presumed that provisions added by the amendment affecting substantive rights are intended to operate prospectively." *Schiavo v. John F. Kennedy Hosp.,* 258 *N.J.Super.* 380, 385, 609 *A.*2d 781 (App.Div.1992), *aff'd,* 131 *N.J.* 400, 620 *A.*2d 1050 (1993). We apply "a two-part test to determine whether a statute could be applied retroactively." *Phillips v. Curiale,* 128 *N.J.* 608, 617, 608 *A.*2d 895 (1992). The first part questions "whether the Legislature intended to give the statute retroactive application." *Ibid.* The second part involves "whether retroactive application of that statute will result in either an unconstitutional interference with 'vested rights' or a 'manifest injustice.'" *Ibid.* In applying this test generally, there are three circumstances that will justify a

retroactive application of a statute: (1) where the Legislature has declared such an intent, either explicitly or implicitly; (2) where the statute is curative; and (3) where the expectations of the parties warrant retroactive application. *Gibbons, supra,* at 522–23, 432 *A.*2d 80; *see Savarese v. New Jersey Auto. Full Ins. Underwriting Assoc.,* 235 *N.J.Super.* 298, 308, 562 *A.*2d 239 (1989) (finding an expressed intent to apply statute retroactively). However, even if a statute is found to apply retroactively based on those factors, under the second prong of the basic test, retroactive application must not "result in 'manifest injustice' to a party adversely affected by such application." *Gibbons, supra,* 86 *N.J.* at 523, 432 *A.*2d 80.

"The 'curative' exception comes into play when a statute amends a previous law which is unclear or which does not effectuate the actual intent of the Legislature in adopting the original act." *Schiavo, supra,* 258 *N.J.Super.* at 386, 609 *A.*2d 781. The purpose of a curative amendment is merely to "remedy a perceived imperfection in or misapplication of a statute." *Ibid.* The amendment explains or clarifies existing law and brings it into "harmony with what the Legislature originally intended." *Ibid.*

The Legislature plainly stated the 1994 amendments do not establish different or new standards and are designed to reaffirm and clarify the existing standards as well as the Attorney General's authority. See discussion, *infra* at 51, 679 *A.*2d at 645 It was expressly recognized that:

> This bill *would not establish a different standard for civil commitment of these former inmates,* like all other persons, they would be subject to involuntary commitment only if a court found them to be mentally ill and dangerous to themselves, others or property. The bill, however, *would reaffirm and clarify the standard for civil commitment applicable to all persons to ensure that those who apply the standard do not erroneously focus on the presence or absence of psychosis in making recommendations concerning the need for civil commitment.*
>
> [*Sponsor Statement, supra,* at 13 (emphases added).]

The amendment revised the definition of "mental illness." *N.J.S.A.* 30:4–27r. In amending the definition of mental illness,

the statute did not change or eliminate any of the original language. The amendment merely added the following language:

> The term mental illness is not limited to "psychosis" or "active psychosis" but shall include all conditions that result in the severity of impairment described herein.
>
> [*N.J.S.A.* 30:4–27r.]

On its face, it is evident that the Legislature intended only to clarify the definition of mental illness to include conditions other than psychosis. *N.J.S.A.* 30:4–27.2, *Historical and Statutory Notes* (discussing background of 1994 legislative amendments). Furthermore, explicit statements surrounding the amendments unequivocally demonstrate the Legislature's concern that psychiatric evaluations *not* focus on "the presence or absence of psychosis." *Sponsor Statement, supra,* at 13 (characterizing change as one that "would reaffirm and clarify the standard for civil commitment applicable to all persons"). *See generally, New Jersey Assembly Bill 155—A Bill Allowing The Civil Commitment Of Violent Sex Offenders After The Completion Of A Criminal Sentence,* 18 *Seton Hall Legis. J.* 890, 896 (1994) (hereinafter *"Assembly Bill"*) (discussing proposed amendments to "correct flaw" in civil commitment statute to protect public).

The other major aspect of the amendments relates to the authority of the Attorney General.

The legislative revisions explicitly permit the Attorney General to seek involuntary commitment pursuant to the existing procedures established in *N.J.S.A.* 30:4–27.10a and b. Under those procedures, the Attorney General may present the court with either the psychiatric findings of a screening facility, *see N.J.S.A.* 30:4–27.10a, or two clinical certifications, at least one of which is prepared by a psychiatrist, *see N.J.S.A.* 30:4–27.10b. The amendment goes further to establish specific authorization for the Attorney General to seek to confine a person as a basis for civil commitment. *N.J.S.A.* 30:4–27.10d. Under that provision, the legislative authority granted to the Attorney General is only to compel a psychiatric examination, not civil commitment. *Ibid.* That determination is left to the court, and then based only on

reasonable cause to believe that involuntary commitment is needed. *Ibid. See, e.g., In re Commitment of Raymond S., supra,* 263 *N.J.Super.* at 431, 623 *A.*2d 249.

It was clearly recognized that the 1994 amendments "would ... give the Attorney General ... clear statutory authority to initiate timely civil commitment proceedings when appropriate." *Sponsor Statement, supra,* at 13. Other legislative history confirms that purpose of the amendments and addresses the scope of the Attorney General's "discretion" to initiate civil commitment:

> Assembly Bill No. 86 of 1994 revises procedures governing the release and involuntary commitment of inmates convicted of certain sexual offenses to ensure the protection of the public is given due consideration. The bill codifies the Attorney General's common law responsibility to act on behalf of the public in seeking civil commitments.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> The bill *authorizes the Attorney General or the county prosecutors, at their discretion, to initiate civil commitment of inmates determined to be mentally ill and dangerous to the public.*
>
> [*Fiscal Estimate to Assembly Bill No. 86,* at 1 (September 26, 1994) (emphasis added) (hereinafter *"Fiscal Estimate."*) ]

"Courts will apply statutes retroactively when the Legislature has expressed its intent, either explicitly or implicitly, that the statute should be applied." *Twiss v. State, Dept. of Treasury,* 124 *N.J.* 461, 467, 591 *A.*2d 913 (1991). The question that must be addressed is whether the Legislature intended the authority that it conferred on the Attorney General to be applied retroactively. We conclude that the Legislature did.

The Legislature perceived that statutory authority delegated to the Attorney General under the 1994 amendments simply confirmed her *parens patriae* authority to seek a court order for the involuntary commitment of a person scheduled for release after serving his sentence, *see N.J.S.A.* 30:4–27.10c, or in accordance with procedures specified under the statute. *N.J.S.A.* 30:4–27.10d. It is readily inferable that the Legislature contemplated the existence of such authority in the Attorney General to effectuate proceedings for a psychiatric examination, and that the 1994 enactment essentially ratified and codified that common law pow-

er. Thus, the 1994 amendments were intended not only to validate the Attorney General's exercise of authority through its retroactive application, but also to recognize the validity of the actions taken.

The legislative intent to apply the amendments retroactively is further bolstered by a consideration of the specific purpose of those amendments and the contextual circumstances surrounding their passage. The 1994 amendments were designed to protect the public against a particular class of potentially dangerous people: convicted sex offenders. *Sponsor Statement, supra,* at 12. The overall effect of the 1994 amendments to the involuntary civil commitment statute, *N.J.S.A.* 30:4-27.1 to 27.10, is to "revis[e] procedures governing the release and involuntary commitment of inmates convicted of certain sexual offenses" in order to ensure public safety. *Fiscal Estimate, supra,* at 1. *See generally Assembly Bill, supra,* at 893 (discussing introduction of early bill to "provide[ ] . . . 'clear and effective means' of confining dangerous individuals who are not mentally ill" and to protect the public from "violent sex offenders.")[1] The legislative history demonstrates that the Legislature pointedly intended the amendments to address cases such as D.C.'s.[2] In fact, D.C.'s release in

---

[1] The goal of the early proposed amendments to the civil commitment law "was to correct the flaw in the system that fails to safeguard the public from violent sex offenders who have completed their sentences but have not been rehabilitated." *Assembly Bill, supra,* at 896. There is no evidence to indicate that there was any change of the goal expressed in those earlier bills incorporated in the bill that ultimately became law. *Id.* at 897–899 (discussing changes to civil commitment law under proposed Assembly Bill 155). *See N.J.S.A.* 30:4-27.1a; *N.J.S.A.* 30:4-27.2r.

[2] Assembly Bill No. 155 was apparently a precursor to the enacted amendments. *See Assembly Bill, supra,* at 893, 896–899. Pursuant to that bill, the civil commitment law would require that the Attorney General be notified prior to the release of an offender; provide procedures to allow the Attorney General to seek civil commitment of a prisoner who has served his sentence and is scheduled for release; and allow the court, on a finding of probable cause, to order the temporary commitment of an inmate. *Id.* at 899.

1992 was the primary motivating factor behind the Legislature's enactment of these amendments.[3]

We conclude that the Legislature intended to enact remedial legislation to effectuate its purpose to confine persons who are found to be dangerous by virtue of mental illness. *N.J.S.A.* 30:4-27.1a; *Assembly Bill, supra,* at 893 (noting that amendments were "to correct [a] flaw" in the civil commitment statute.) It did so by clarifying the standards applicable to all persons suffering mental illness; it thereby reaffirmed but did not change existing law. Further, it authorized the Attorney General to initiate commitment proceedings in the interest of public safety by obtaining a psychiatric examination; it perceived that it was codifying existing common law powers of the Attorney General. Finally, it clearly intended that the law apply to released convicted sexual offenders, specifically to offenders like D.C., even though their release antedated the enactment of the amendments.

The final test in the retroactivity analysis is whether that application will result in "manifest injustice." This Court in *Gibbons, supra,* cautioned that in determining whether retroactivity should apply, courts must guard against the potential for "manifest injustice." 86 *N.J.* at 523, 432 *A.*2d 80. That element of the retroactivity analysis is informed by the determination of whether D.C.'s constitutional rights of due process would be violated by the retroactive application of the 1994 amendments.

## IV

Whether the procedures undertaken to commit D.C. were sufficiently protective of D.C.'s liberty interests implicates concerns of

[3] The legislative background of the 1994 amendments demonstrates that the introduction of the bill was attended by considerable outrage over D.C.'s release. *See* David Glovin, *The Loophole That Let An Unrepentant Rapist Go Free,* The Record, Jan. 17, 1993, at RO–1. Following D.C.'s release, then-Attorney General Robert Del Tufo publicly stated his concern that the civil commitment system does not address the confinement of dangerous individuals who are not mentally ill. *See Assembly Bill, supra,* at 896.

both substantive and procedural due process. The United States Supreme Court has held that involuntary commitment must be initiated by a judicial hearing at which the State must prove by clear and convincing evidence that the individual is mentally ill and dangerous to self or others. *See Foucha v. Louisiana, supra,* 504 *U.S.* at 80, 112 *S.Ct.* at 1786, 118 *L.Ed.*2d at 448; *Addington v. Texas, supra,* 441 *U.S.* at 426–27, 99 *S.Ct.* at 1809, 60 *L.Ed.*2d at 331–32; *Vitek v. Jones,* 445 *U.S.* 480, 492–93, 100 *S.Ct.* 1254, 1263, 63 *L.Ed.*2d 552, 564–65 (1980). These standards parallel our own constitutional requirements. *See In re N.N., supra,* 146 *N.J.* at 130–131, 679 *A.*2d 1174; *In re S.L., supra,* 94 *N.J.* at 138, 462 *A.*2d 1252; *In re D.M.,* 285 *N.J.Super.* 481, 667 *A.*2d 385 (App.Div. 1995); *In re Raymond S., supra,* 263 *N.J.Super.* 428, 623 *A.*2d 249.

■ The statutory standard to establish that a person is "in need of involuntary commitment" under the civil commitment statute as amended satisfies the constitutional measure of substantive due process. The standard requires both mental illness and dangerousness, referring to

> an adult who is mentally ill, whose mental illness causes the person to be dangerous to self, or dangerous to others or property and who is unwilling to be admitted to a facility voluntarily for care, and who needs care at a short-term care, psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.
>
> *[N.J.S.A.* 30:4–27.2m].

The definition of mental illness prior to the 1994 amendments referred to "a current, substantial disturbance of thought, mood, perception, or orientation which significantly impairs judgement, behavior or capacity to recognize reality." *N.J.S.A.* 30:4–27.2r. The amendment of that definition does not enlarge or change the intended meaning of the original definition, but simply adds clarifying language to denote that the definition of "mental illness" is not limited to or does not require "psychosis." As earlier determined, mental illness so clarified and defined does not derogate the importance of an individual's liberty interest, and does not change the balance of considerations that must be weighed in

the involuntary commitment determination. *Supra* at 43–44, 50–52, 679 *A.2d* at 640, 644–645. Consequently, the retroactive application of the standard of mental illness does not offend substantive due process.

■ We consider next whether D.C. was denied procedural due process through the proceedings that led to his involuntary commitment.

The dissent below concluded that "D.C. was afforded due process by a less intrusive means than provided for under the statutory procedure." 281 *N.J.Super.* at 123, 656 *A.2d* 861. We find in this case, D.C. was afforded full procedural due process protections. *See United States Trust Co. v. New Jersey*, 431 *U.S.* 1, 19 n. 13, 97 *S.Ct.* 1505, 1516 n. 13, 52 *L.Ed.*2d 92, 106 n. 13 (1977) (emphasizing that Due Process Clause of Fourteenth Amendment is applicable only to retroactive criminal legislation, and "generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive' "); *Rothman v. Rothman*, 65 *N.J.* 219, 225 n. 4, 320 *A.2d* 496 (1974) (same). *Cf. In re Raymond S., supra*, 263 *N.J.Super.* at 432–34, 623 *A.2d* 249 (finding involuntarily committed patient deprived of procedural due process when among other factors patient's counsel was not afforded opportunity to cross-examine and examining doctor had not undertaken a recent or careful examination). D.C. was afforded notice, the opportunity to challenge the sufficiency of the application, adequate prehearing examinations, full hearings, representation of counsel and the opportunity to present evidence and confront witnesses through cross-examination. These procedural protections apply in civil commitment hearings. *In re S.L., supra*, 94 *N.J.* at 137, 462 *A.2d* 1252 (citing *Vitek v. Jones, supra*, 445 *U.S.* at 480, 100 *S.Ct.* at 1254, 63 *L.Ed.*2d at 552). D.C.'s rights were scrupulously protected throughout every stage of the commitment process, from the initial commitment proceeding, through the plenary commitment hearing and subsequent commitment review proceedings. In view of the proceedings in their

entirety, D.C. suffered no violations of constitutional procedural due process.

We also conclude that the proceedings below did not subject D.C. to a "manifest injustice." The concern that is implicated by the standard of "manifest injustice" in assessing the retroactive application of a statute need not reach constitutional levels. Hence, while our inquiry into whether there has been a "manifest injustice" is informed by our consideration of issues of constitutional due process, it is not necessarily determined by those issues. Rather we look to matters of unfairness and inequity. *Phillips v. Curiale, supra,* 128 *N.J.* at 625, 608 *A.*2d 895. In the typical setting concerning "manifest injustice," reliance on existing law by the affected party and the unfairness of changing that law are the important factors in making the retroactivity decision. *Gibbons, supra,* 86 *N.J.* at 523–24, 432 *A.*2d 80.

Here, there can be. no concerns arising from a reliance on existing commitment laws that would render the application of the 1994 amendments unfair, arbitrary, or inequitable. There can be no plausible contention that a convicted sex offender with a history of mental illness and dangerousness would have an expectation derived from a reliance on existing commitment laws that he would, subject to full due process, not be required to submit to a psychiatric examination if his conduct posed a danger to the public safety. We are satisfied that the retroactive application of the 1994 amendments did not result in "manifest injustice."

## V

Finally, we consider whether there was sufficient evidence to order the commitment of D.C. The scope of appellate review of a commitment determination is extremely narrow and should be modified only if the record reveals a clear mistake. *State v. Fields,* 77 *N.J.* 282, 311, 390 *A.*2d 574 (1978); *In re Commitment of J.L.J.,* 196 *N.J.Super.* 34, 49, 481 *A.*2d 563 (App. Div.1984), *certif. denied,* 101 *N.J.* 210, 501 *A.*2d 893, 894 (1985). The appropriate inquiry is to canvass the significant amount of

expert testimony in the record and determine whether the lower courts' findings were clearly erroneous. *Fields, supra,* 77 *N.J.* at 311, 390 *A.*2d 574.

The final determination of dangerousness lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. The ultimate decision on dangerousness is, therefore, a legal one, not a medical one, even though it is guided by medical expert testimony. *In re Newsome,* 176 *N.J.Super.* 511, 516, 424 *A.*2d 222 (App.Div.1980); *State v. Krol, supra,* 68 *N.J.* at 261, 344 *A.*2d 289.

The record contains the medical opinions of eight experts. They testified at different stages of the proceedings below: Dr. Jackson's certification was used in determining whether a psychiatric examination was needed; Drs. Chamberlain and Kern testified as a basis for determining temporary involuntary commitment; Drs. Martindale, Chamberlain, Kern, and Greenfield testified about the need for continued involuntary commitment; Drs. Cohen, Chamberlain, Sadoff, and Ghahramani testified at the first commitment review hearing; and Drs. Ghahramani, Greenfield, and Liccardo testified at the second commitment review hearing.

At the various stages, the trial courts determined that D.C. was dangerous. According to *N.J.S.A.* 30:4–27.2i, being dangerous to others or property requires "that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future." The determination of dangerousness may consider "a person's history, recent behavior, and any recent act or threat." *N.J.S.A.* 30:4–27.2i.

All the physicians concluded that D.C. suffered from an antisocial personality disorder and fantasies of sexual sadism. They disagreed about whether "psychotic behavior" was required for

mental illness commitment. Regardless of that disagreement, their findings provide ample evidence of D.C.'s dangerousness caused by his condition of mental illness.

Dr. Jackson found that D.C. presented a clear and present danger to others due to his rage, low self-esteem, resentment, impaired judgment, and stated desire to commit more crimes including murders. Dr. Chamberlain found that D.C. was mentally ill as a dangerous, disturbed, schizoid person with hostile aggressive thoughts who could not distinguish his uncontrollable fantasies from reality. Dr. Kern found that D.C. was not imminently dangerous but an extremely angry person with an inability to distinguish his fantasies from reality. He felt D.C. was mentally ill and potentially dangerous to others. Dr. Martindale felt D.C. suffered from a significant character disorder that dwelled on violent fantasies. According to Dr. Martindale, D.C. was mentally ill and was more likely to commit future sexual assaults than the average person would.

Dr. Greenfield believed D.C. showed signs of progress, appeared to be in control, and was not mentally ill. The doctor believed that D.C. had no substantial likelihood of dangerous conduct even if he was potentially dangerous. Dr. Sadoff, retained by Trenton Psychiatric Hospital to provide an independent opinion, believed D.C. was not mentally ill because he did not appear to be psychotic. Dr. Sadoff did not predict whether he posed a danger to the community.

Seven of the eight physicians, all except Dr. Jackson, believed they could not predict when D.C. might cause harm to people again. Significantly, the majority of examining doctors felt D.C.'s condition—which had resulted in violent criminal acts—did not improve during therapy, and as a result he posed a potential threat.

When taken as a whole, the testimony of the physicians amply satisfied the criteria for mental illness and for dangerousness, based on clear and convincing evidence. Based on that evidence, the trial courts were constrained to reach a legal determination

that there was probable cause to compel D.C. to submit to temporary confinement for purposes of psychiatric evaluation, and, thereafter, clear and convincing evidence that continued involuntary commitment was justified. *See State v. Krol, supra,* 68 *N.J.* at 261, 344 *A.*2d 289. The courts were, under the circumstances, impelled to reach a reasoned determination informed by and founded on the evidence, but were not required to accept all or any part of the expert opinions. *See, e.g., State in the Interest of C.A.H. & B.A.R.,* 89 *N.J.* 326, 343, 446 *A.*2d 93 (1982) (stating that expert testimony not controlling in determining rehabilitative prospects). The courts could, and we are satisfied they did, search, analyze, and evaluate the record to reach a conclusion that is anchored in the evidence.

We, therefore, hold that the trial court's determinations, initially to compel D.C. to undergo psychiatric evaluation, and later for continued commitment, were adequately supported by the factual record.

## VI

The judgment of the Appellate Division is reversed.

*For reversal*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.