# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2374-21

IN THE MATTER OF THE
CIVIL COMMITMENT OF
R.H., SVP-487-08.

_____

Submitted April 23, 2024 – Decided May 9, 2024

Before Judges Enright, Paganelli and Whipple.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. SVP-487-08.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant R.H. (Carol L. Widemon, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent State of New Jersey (Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen J. Slocum, Deputy Attorney General, on the brief).

PER CURIAM

R.H. appeals from a February 2022 order continuing his civil commitment in the Special Treatment Unit (STU), pursuant to the New Jersey Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38.[1]  We affirm.

We glean the relevant facts and procedural history from the record.  In 1998, R.H. pleaded guilty to the sexual assault of an eight-year-old male and was sentenced to seven years in prison.  While incarcerated, R.H. pleaded guilty to aggravated sexual assault and criminal sexual contact with another male child.  The second guilty plea encompassed pre-incarceration activity with a child between the ages of twelve and fifteen years old that lasted "over a protracted period of time."  On the second plea, R.H. was sentenced to fourteen years in prison.

After serving his sentences, R.H. was admitted to the STU in April 2008, and civilly committed in July 2009.  R.H. was discharged in August 2016 after his treatment team determined his risk of reoffending "would be sufficiently mitigated with an appropriate discharge plan."

---

[1]  We use initials to refer to R.H. because records pertaining to civil commitment proceedings under the SVPA are deemed confidential under N.J.S.A. 30:4-27.27(c) and are excluded from public access pursuant to Rule 1:38-3(f)(2).

However, within five months of R.H.'s discharge, his parole officer received information from the Linden Police Department that R.H. might have been using a Facebook profile—under the alias "BO"—to contact women he knew in his childhood. The women reported this activity to the police and provided screenshots of the Facebook messages. The messages consisted of BO attempting to arrange a playdate between the women's children and BO's alleged "nephew." Upon further investigation, R.H. admitted to maintaining the Facebook account; using the alias BO; and messaging the women to set up playdates with their children. A search of R.H.'s phone revealed: (1) he visited pornographic websites; (2) "links on his browser history were titled 'rape,' 'boy sexually abused,' and 'meet young boys'"; and (3) he "frequented the casual sex classifieds on [C]raigslist." R.H.'s activities violated the conditions of his discharge, and he was returned to the STU in 2017.

R.H. filed an application for release from the term of civil commitment. In February 2022, the judge conducted a one-day hearing. During the hearing, the judge admitted experts' reports and their curriculum vitae into evidence. She also heard testimony from the State's witnesses Roger Harris, M.D., an expert in the field of forensic psychiatry; and Christine Zavalis, Psy.D., an expert in the field of forensic psychology. Dr. Zavalis was a member of R.H.'s treatment

3

team.[2]  The judge also heard testimony from R.H. and Christopher Lorah, Ph.D., R.H.'s expert in the field of forensic psychology.

Dr. Harris opined R.H. "insufficiently progressed in treatment to succeed on release."  He stated R.H.'s "overall pattern of sexual offending was significant."  He also noted R.H.'s "inability to control his sexual arousal and denial of his offenses."

The doctor indicated:

> just prior to [R.H.'s] August 2016 discharge from the STU, he was utilizing social media during his furloughs to engage in high-risk behavior and to reinforce his deviant sexual behavior, searching internet sites for "rape", "boys sexually abused" and "meet young boys." [R.H.] was viewing pornography involving rape and sexual abuse.  He was also arranging for play dates with women and their minor children.  He quickly demonstrated an inability to self-regulate his deviant sexual behaviors.

Dr. Harris testified R.H. was only addressing issues that returned R.H. to the STU in 2017.  The doctor noted R.H. scored a five on the Static-99R,[3]

---

[2]  See N.J.S.A. 30:4-27-3(b).

[3]  "The Static-99R is an actuarial tool, designed to predict the recidivism risk of sexual offenses in adult male sex offenders who have been convicted of at least one sexual offense."  Commonwealth v. George, 477 Mass. 331, 335 n.2 (Mass. 2017).  The Static-99R is a revised version of the Static-99.  Ibid.; see also In re Civil Commitment of R.F. 217 N.J. 152, 164 n.9 (2014) (quoting In re

4

indicating an above average risk to reoffend. In addition, Dr. Harris indicated R.H.'s dynamic and psychiatric factors increased his risk to reoffend.

The judge deemed Dr. Harris's testimony "credible with no obvious interest in the outcome of the case." She noted his "demeanor was unremarkable, he was confident in his testimony, ultimate diagnosis, and recommendations."

Dr. Zavalis noted R.H.'s "current engagement with treatment at the STU [wa]s superficial." She concluded he remained manipulative and surrounded himself with chaos. The doctor also stated R.H. scored a five on the Static-99R, indicating an above average rate to reoffend. Dr. Zavalis noted, in the STU, R.H. had "more stability and behavioral controls in place."

The doctor opined that:

> given the static and dynamic risk factors assessed and the level of treatment progress achieved, [R.H.] remain[ed] at high risk to sexually reoffend if not confined to a secure setting such as the STU. Although he ha[d] remained a member of the therapeutic community and appear[ed] actively engaged in treatment, though superficially, the recommendation . . . [wa]s that he remain in Phase 3B [at the STU]. [R.H.] w[ould] be encouraged to demonstrate active

Commitment of R.S., 173 N.J. 134, 137 (2002)) (explaining "that actuarial information, including the Static-99, is 'simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA.'").

engagement in treatment by addressing the team's recommendations as outlined in his treatment plan.

The judge found Dr. Zavalis "credible with no obvious interest in the outcome of the case." She noted the doctor's "demeanor was unremarkable, she testified consistently with her report, she was confident in her testimony, ultimate diagnosis, and recommendation."

Dr. Lorah recommended "immediate discharge planning." The doctor credited R.H. for "journal[ing], attend[ing] substance abuse groups, and [being] actively involved in his treatment." Further, the judge noted Dr. Lorah's finding that R.H. "scored a four (4) on the Static-99R which place[d] him in the 'above average' risk category to reoffend." Dr. Lorah determined R.H. demonstrated: (1) "sexual preoccupation"; (2) "poor cognitive problem solving"; and (3) "antisocial traits" but "ha[d] not shown th[ese] behavior[s] since his return to the STU."

Dr. Lorah opined R.H.'s "predisposing disorders d[id] not currently impact his emotional, cognitive, and/or volitional capacity to such a degree as to make him highly likely to sexually reoffend in the foreseeable future." Therefore, Dr. Lorah concluded R.H. was "highly likely to comply with his conditional discharge planning." The conditions the doctor recommended included: (1) supervised and unsupervised furloughs; (2) group and individual therapy; (3)

6

evaluation and monitoring of his relationships and reactions to life stressors by professionals; (4) "meet[ing] with supervising authorities regularly and other stipulations commonly mandated for released sex offenders"; (5) no contact with minors; (6) GPS monitoring, with authorities taking action if R.H. was "discovered near areas known for prostitution, alcohol, and drugs"; (7) official action "if he visit[ed] any high-risk places such as parks, schools, beaches, or other places where minors congregate"; (8) curfew; (9) restricted internet and phone use and "monitored to limit contact with pornography and[] social media dating sites"; and (10) continued treatment in the community.

Although the judge found Dr. Lorah "was confident in his testimony, ultimate diagnosis, and recommendations," she found his testimony to be "less credible" because of the doctor's "obvious interest in the outcome of the case," since he was a "hired expert." In addition, the judge noted Dr. Lorah was "defensive at times."

The judge summarized R.H.'s testimony. She found he testified: (1) the "opinions from his treatment team were authored by 'a social worker'"; (2) he gave one hundred percent in treatment and was not being superficial; and (3) his "treaters" took his return personally. Moreover, while noting R.H. stated he took full responsibility for his relapse, she determined his testimony "suggest[ed] the

opposite." She found R.H. "minimized his behaviors while on release, suggesting the reason he failed . . . was that he did not utilize his support team," and "appeared to blame his treatment team for his present circumstances." Ultimately, the judge determined R.H.'s testimony "did not add anything to th[e] hearing" and "detracted" from Dr. Lorah's testimony.

After assessing "the evidence submitted at the hearing, including the testimony of the experts, . . . [the judge] f[ound] . . . the State ha[d] shown by clear and convincing evidence that [R.H.] ha[d] a high likelihood of reoffending if released from the secure control of the STU."

The judge also found:

> the testimony of Dr. Zavalis most credible and compelling. [The doctor's] report suggest[ed] a thorough analysis was completed regarding [R.H.]'s past and current progress while remaining in the therapeutic community. [The doctor] admit[ted R.H.] appear[ed] actively engaged in treatment, although he [wa]s encouraged to remain vigilant about the issues he ha[d] acknowledged ha[d] impacted his ability to meaningfully benefit from treatment in the past. These include[ed] not being fully engaged, limited transparency, secret-keeping, manipulating, not applying what he ha[d] learned while at the STU, being overconfident, not being vulnerable, being attention seeking, and intentionally creating chaos.

In addition, the judge concluded R.H.'s

A-2374-21

sexual history [was] quite significant as to the issues of his impulsivity and inability to control his emotions and actions. The index offenses, coupled with his deviant sexual behavior while on release, unequivocally show[ed] th[e] court that [R.H. wa]s unable to rationally control his emotions and behaviors when he [wa]s met with challenges which require[d] a utilization of skills learned while at STU, including relapse prevention techniques.

Ultimately, the judge determined R.H.'s

current diagnosis, coupled with Antisocial Personality Disorder, cause[d her] to have significant concerns. Additionally, [R.H.'s] deviant sexual behavior was cultivated during his prior furloughs in anticipation of his last discharge. It [wa]s clear he [wa]s able to contain his deviant behavior in a controlled setting, however, the court [wa]s less convinced he ha[d] fully acquired the skills necessary to control his behavior when not met with a controlled setting. Even Dr. Lorah appear[ed] to recommend significant controls over [R.H.'s] treatment and independence, despite opining that he [wa]s ready for discharge. The court f[ound] that when [R.H.] was presented with a situation involving freedom from authority and accountability, he failed to successfully utilize the strategies taught at STU and reverted immediately to deviant sexual behavior. [R.H.] ha[d] yet to fully embrace all treatment modalities available to him, as set forth in Dr. Zavalis'[s] report, and could certainly benefit from continued relapse prevention.

On appeal, R.H. contends the judge erred by: (1) failing to "focus on whether [he] was a present danger to the community" and, instead, used historic statements, behaviors, and reports; and failed to consider positive information

9

in Dr. Zavalis's testimony and report; and (2) omitting from her analysis "the very low rates of recidivism for persons with R.H.'s Static-99R score." R.H. requests our de novo review, for entry of judgment, and an immediate discharge plan.

We begin our discussion with a review of the principles governing our analysis. "The scope of appellate review of a commitment determination is extremely narrow." R.F., 217 N.J. at 174 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid.

In addition, "[w]e give deference to the findings of . . . judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Accordingly, [we will] not modify a trial court's determination either to commit or release an individual unless the 'record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162).

The SVPA permits the State to involuntarily commit a person, if by clear and convincing evidence, the State can

> establish three elements: (1) that the individual has been convicted of a sexually violent offense, (2) that he suffers from a mental abnormality or personality disorder, and (3) that as a result of his psychiatric abnormality or disorder, "it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend."[4]
>
> [Id. at 173 (quoting In re Commitment of W.Z., 173 N.J. 109, 130 (2002)) (internal citations omitted).]

See also N.J.S.A. 30:4-27.26.

The SVPA "requires annual court review hearings on the need for continued involuntary commitment." W.Z., 173 N.J. at 133; see N.J.S.A. 30:4-27.35. "Th[e] periodic reviews . . . allow adequate opportunity to assess fresh information concerning the committee's dangerousness." Ibid.

"[E]xpert witnesses in the fields of psychiatry and psychology routinely play leading roles in SVPA commitment hearings." In re Civil Commitment of D.Y., 218 N.J. 359, 382 (2014); see N.J.S.A. 30:4-27.30(b). An expert can "rel[y] on prior evaluations, treatment records, [and] other appropriate

---

4 The parties have stipulated to elements (1) and (2).

11

documents" in reaching their opinion. In re Civil Commitment of A.Y., 458 N.J. Super. 147, 170-71 (App. Div. 2019).

The judge can consider "the testimony of experts and the risk assessment instruments on which they rely," as they constitute "pivotal proofs on the question [of] whether [an] individual is highly likely to offend again." Matter of P.D., 243 N.J. 553, 568 (2020). However, "[a] trial judge is 'not required to accept all or any part of [an] expert opinion[].'" R.F., 217 N.J. at 174 (second and third alterations in original) (quoting D.C., 146 N.J. at 61). "The ultimate determination is 'a legal one, not a medical one, even though it is guided by medical expert testimony.'" Ibid. (quoting D.C., 146 N.J. at 59).

We apply these well-established principles to the matter here, and affirm. Initially, we reject R.H.'s request for a de novo review. A de novo review would be inapposite to our deferential standard of review.

Moreover, R.H.'s contention the judge erred by considering historical, rather than fresh, information is misplaced for two reasons. First, experts rely on historical information to reach their opinions. See A.Y., 458 N.J. Super. at 170-71. As a corollary, a judge's reliance on an expert's opinion would similarly include historic information. Second, the judge's conclusion was based on R.H.'s present condition. The judge noted she had "significant concerns" and

R.H. "ha[d] yet to fully embrace all treatment modalities available to him . . . and could certainly benefit from continued relapse prevention."

R.H.'s contention the judge failed to consider Dr. Zavalis's positive information is similarly misplaced. First, the judge could accept or reject any part of an expert's opinion. See R.F., 217 N.J. at 174. Second, the judge noted the positives in Dr. Zavalis's statement that R.H. was actively, albeit superficially, engaged in treatment and had "more stability and behavioral controls in place" in the STU.

Finally, while acknowledging a judge can "consider, weigh, or even reject" actuarial assessment information, R.H. nonetheless argues the judge erred by "omit[ting] any consideration of" his Static-99R score in the context of certain "dynamic risk factors." R.H. further contends Dr. Lorah did a more thorough analysis. These arguments have no merit. The judge could reject R.H.'s Static-99R score and could accept or reject the expert's opinion. Id. at 164, 174. Given this latitude, and our deference, we conclude there is no reason to question her analysis or her consideration of R.H.'s Static-99R score or the experts' opinions.

A-2374-21

To the extent we have not addressed any of R.H.'s remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2374-21