919 A.2d 864 (2007)
392 N.J. Super. 22
In the Matter of The CIVIL COMMITMENT OF R.Z.B., SVP-367-04.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 2006.
Decided April 9, 2007.
*866 William F. Culleton, Jr., Designated Counsel, argued the cause for appellant (Ronald K. Chen, Public Advocate, attorney; Mr. Culleton, of counsel and on the brief).
Lisa Marie Albano, Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Ms. Albano, on the brief).
Before Judges A.A. RODRÍGUEZ, COLLESTER and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
Following three days of hearings, the trial court on February 16, 2005 issued a final order civilly committing R.Z.B. to the Special Treatment Unit (STU) for the treatment of persons pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. He appeals from that order on various grounds. We affirm.

I.
R.Z.B. has a long history of involvement in criminal and sexually inappropriate conduct. His sexual issues date back to the age of sixteen[1], when he was molested by an adult stranger claiming to be a photographer. Since that time, he has had a lengthy criminal record spanning over three decades, beginning with convictions in the New York state courts in the early 1980s.
In 1981 R.Z.B. brought a thirteen-year-old boy and a fourteen-year-old boy to his apartment in The Bronx, New York and engaged them in oral sex. He also made one of those children take pictures of him performing sex with the other. In that same year, R.Z.B. admitted to the mother of a different nine-year-old boy that he had performed oral sex on her son.[2] After being charged with these offenses in the New York courts, R.Z.B. pled guilty in 1983 to sodomy in the second and third degrees. He was sentenced by the New York court to two consecutive five year periods of probation.
In 1985 R.Z.B. was again arrested in New York for committing sodomy with three boys between the ages of eleven through fourteen. This led to R.Z.B. being found guilty of two counts of sodomy in a trial by jury. However, that conviction *867 was reversed on appeal in 1987 and remanded. He then pled guilty to one count of sodomy for the same charged conduct and was sentenced to one to three years in prison. That term was extended further because the 1985 sodomy offenses occurred while he had been on probation. R.Z.B. was paroled in New York in January 1992.
In June 1993 R.Z.B. and relatives of an acquaintance named E.F. purchased a house in Bayonne, New Jersey. R.Z.B. and E.F. occupied separate portions of the basement of that home. The two men placed an advertisement in the newspaper inviting boys between the ages of fifteen-and-a half and seventeen-and-a-half to perform construction work on the house. The Bayonne police were notified in that same month of a possibility of illegal activity in the house. The police placed the house under surveillance.
From June through September 1993 R.Z.B. repeatedly brought groups of underprivileged male youths from The Bronx to his Bayonne house. The youths went with R.Z.B. to a nude beach at Sandy Hook, and would sometimes stay over the night. R.Z.B. showered with the boys, and had them play games in which he encouraged them to strip.
During this time frame Detective Robert Hoever, an undercover agent with the New Jersey State Police, established a personal relationship with R.Z.B. As part of his undercover investigation, Hoever arranged with R.Z.B. and E.F. to exchange $25,000 for photographic slides of child pornography. On September 9, 1993, R.Z.B. made such an exchange of thirty-one slides, which he had brought to Bayonne from New York. Eight of the slides showed a young boy with an erection. Upon viewing the slides, Bayonne law enforcement officers entered the home and arrested R.Z.B. and E.F.
Following the arrests, FBI agents found several sexually explicit videotapes in the Bayonne residence. A search of R.Z.B.'s other house in Mount Vernon, New York uncovered other sexually explicit tapes. One videotape, made in the basement of the Bayonne house, showed R.Z.B. frolicking with two seventeen-year-old boys, naked and in various stages of sexual arousal. Another videotape seized in Mount Vernon depicted a twelve-year-old boy and a fourteen-year-old boy engaged in sexually explicit conduct. A third videotape showed a thirteen-year-old boy nude on the beach and focused on his genital area. The evidence also included an audio-taped telephone conversation in which R.Z.B. persuaded a twelve-year-old boy to be filmed naked, by taking advantage of the boy's desire for a new bicycle.[3]
R.Z.B. and E.F. were subsequently indicted in the United States District Court for the District of New Jersey. The indictment charged R.Z.B. with conspiracy to induce underage persons to cross state lines to engage in sexually explicit activity illegal under a state statute and to engage in sexually explicit conduct to produce a visual depiction to be transported across state lines, all in violation of 18 U.S.C.A. §§ 2423 and 2251(a). Defendant was additionally charged with conspiracy to transport, receive, distribute, possess, and ship such depictions in violation of 18 U.S.C.A. §§ 2252(a)(1), 2252(a)(2), and 2252(a)(4)(B).
At R.Z.B.'s ensuing federal trial in April 1995, the Government's proofs showed that several of the young men who had been lured to R.Z.B.'s house in Bayonne were *868 under the age of eighteen and, therefore, minors. However, the Government did not prove that those youths were under the age of sixteen. That lack of proof was problematic as to one aspect of the federal indictment, which charged R.Z.B. under 18 U.S.C.A. § 2423 with conspiracy to transport persons under the age of eighteen across state lines to commit a sexual offense contrary to a state statute. The pertinent state statute on that count, N.J.S.A. 2C:14-1 to -3, only makes such conduct with a minor, as described in the indictment, a crime if the victim is under sixteen. Because none of the victims of sexual activity lured to New Jersey were proven to be under the age of sixteen, the Government could not establish that R.Z.B. had transported, or had conspired to transport, minors across state lines to violate that pertinent state criminal law. However, there was substantial proof adduced as to several of the remaining charges in the indictment that did not hinge upon the age requirements of the state statute.
In April 1995 the federal jury found R.Z.B. guilty of sexual exploitation of children; interstate transportation of child pornography; receipt, distribution and reproduction of child pornography; possession of child pornography and conspiracy. The jury's verdict was factually supported in particular by evidence that R.Z.B. had enticed the two seventeen-year-old boys to make a sexually explicit video, and then carried that videotape across state lines from New Jersey to New York.
During R.Z.B.'s federal sentencing, the district judge specifically observed, among other things, that R.Z.B. was "attracted to boys and youths." R.Z.B. was sentenced to 121 months in federal prison, followed by three years of probation. Further, the district judge ordered R.Z.B. to "participate in a mental health program for evaluation and/or treatment if directed by the [United States] Probation Office," mandating that he was to "remain in treatment until satisfactorily discharged and with the approval of the [federal] Probation Office." Standard provisions of R.Z.B.'s federal probation also required him to remain in New Jersey within the judicial district of the court and to not associate with any person convicted of a felony.
R.Z.B.'s motion for reconsideration of his sentence was denied. His appeal to the United States Court of Appeals for the Third Circuit was unsuccessful.
While housed in the federal penitentiary in Butner, North Carolina, R.Z.B. enrolled in a Sex Offender Treatment Program in November 2000. He was discharged from that program three months later because of "inappropriate" materials that had been found by corrections staff among his possessions.
R.Z.B. was released from federal prison on September 25, 2002 and began living in Union City. He registered as a sex offender, pursuant to Megan's Law, N.J.S.A. 2C:7-1 to -19. In 2003 R.Z.B. filed a motion in the Law Division seeking to be removed from the Megan's Law registry. That motion was denied, a disposition we affirmed in 2005. See In re Registrant R.B., 376 N.J.Super. 451, 474, 870 A.2d 732 (App.Div.), certif. denied, 185 N.J. 29, 878 A.2d 848 (2005).
In September 2003 R.Z.B. violated the terms of his federal parole by traveling out of New Jersey on two occasions that month to The Bronx, New York, and by socializing with E.F., a convicted felon. R.Z.B. was found guilty of these violations by the federal judge who had originally sentenced him. R.Z.B. consequently was returned to federal custody on January 12, 2004, and was sent to a federal correctional facility at Fort Dix for three months. The district judge specified that upon R.Z.B.'s *869 completion of his additional punishment for the parole violations, he would no longer have to serve a further term of supervised release.
Shortly before R.Z.B.'s scheduled release from federal custody on the parole violations, the New Jersey Attorney General began the process of seeking his civil commitment under the SVPA. The Attorney General arranged for two psychiatrists to interview and evaluate R.Z.B. in federal prison for that purpose. Those interviews produced expert reports indicating that R.Z.B. suffered from paraphilia NOS, (Not Otherwise Specified), pedophilia and personality disorder NOS. The experts opined that R.Z.B. was highly likely to reoffend if released into the community. On April 6, 2004, the Law Division temporarily ordered R.Z.B.'s civil commitment to the STU, pending a full commitment hearing. R.Z.B. was released from federal custody on his scheduled federal release date of April 9, 2004, and was immediately placed in the STU under State supervision.
Apparently seeking the intervention of the federal judge who had sentenced him, R.Z.B. wrote a letter[4] to the district judge, informing the judge that the New Jersey Attorney General was pursuing R.Z.B.'s civil commitment as a sexually violent offender. The district judge responded to R.Z.B. in a letter dated May 14, 2004. In that letter, the judge noted that he had given R.Z.B. a sentence significantly below the pertinent federal sentencing guidelines for what the judge characterized as R.Z.B.'s "technical violations" of parole. The district judge further commented:
My reason [for the below-guidelines sentence] was that it was evident to me that you were fully able to lead a constructive life and that you did not pose any danger to under-age persons. This conclusion was based upon my continuing involvement in your case since its inception in 1994, your gainful employment during your period of release, your successful therapy with Dr. Martinez, your successful passing of a lie detector test and other evidence that you had had no involvement with under-age persons and that your sexual orientation was being directed into appropriate channels.
Nonetheless, the district judge advised R.Z.B. that the federal court lacked the authority to intercede in the State's proceedings under the SVPA:
The proceedings which the State of New Jersey brought against you are not within my jurisdiction.
The district judge did, however, offer R.Z.B. access to pertinent materials from his federal probation files.
R.Z.B.'s commitment hearing was conducted before Judge Philip Freedman on December 20, 21 and 22, 2004. Five mental health experts testified.
Dr. Natalie Barone, a psychologist, testified first for the State. Dr. Barone had interviewed R.Z.B. for two hours, and also reviewed his treatment and criminal records. She opined that R.Z.B. was part of "a subculture of pedophiles who groomed boys to meet their sexual desires and then rewarded them with gifts." She noted that R.Z.B. has repeatedly described himself as a "boy lover," a description which he claims is not meant to be sexual. Dr. Barone stated that his deviant behavior is both "compulsive" and "consistent."
Dr. Barone found R.Z.B. narcissistic to a degree that amounts to a "high psychopathy." She noted his IQ score is high, indicating that he can be proficient at manipulating people. According to Dr. Barone, R.Z.B.'s combination of psychopathy and his deviant arousal to young males *870 is very predictive of future aberrant behavior. It is also, in her view, resistant to therapy. Based upon these considerations, Dr. Barone found R.Z.B. to be at high risk for reoffense.
The State also presented expert testimony from Dr. Michael McAllister, a psychiatrist. Dr. McAllister met with R.Z.B. on two occasions for a total of three and a half hours. He diagnosed R.Z.B. as having personality disorder N.O.S. (Not Otherwise Specified) with psychopathic features. Dr. McAllister further diagnosed R.Z.B. with pedophilia. Consistent with Dr. Barone's evaluation, Dr. McAllister opined that the risk of R.Z.B. reoffending was "extreme."
The defense called three experts. The first of these was Timothy Foley, Ph.D., a psychologist, who had previously interviewed R.Z.B. for about two and one half hours. Dr. Foley likewise diagnosed R.Z.B. with personality disorder NOS and with pedophilia. However, Dr. Foley regarded other aspects of R.Z.B. as "stable." He recommended that R.Z.B. be released to the continued care of his former treating psychologist, Douglas Martinez, Ph.D. On cross examination, Dr. Foley acknowledged that he was unaware of some documents in R.Z.B.'s file that had been noted by the State's experts, including a letter R.Z.B. apparently wrote in 2001 espousing the view that it should be "legally okay" to have sex with teenagers.
The treating therapist, Dr. Martinez, next appeared for the defense. Dr. Martinez had treated R.Z.B. while he was on parole from April 2003 through January 2004. Dr. Martinez stated that R.Z.B. had a high level of treatment compliance. He opined that R.Z.B. had the "capacity for change" and that he could be treated successfully in the community under supervision.
Lastly, the defense presented Dr. Roger Harris, a psychiatrist. Dr. Harris had interviewed R.Z.B. twice, for a total of six hours. Dr. Harris stated that he did not believe R.Z.B. was a psychopath or suffered from a full-fledged personality disorder. However, Dr. Harris diagnosed R.Z.B. with paraphilia NOS, along with pedophilia, narcissism, and anti-social traits. Dr. Harris suggested various conditions if R.Z.B. were released into the community. These conditions included sex offender therapy, workplace prohibitions on contact with children or teenagers, frequent polygraph exams, anti-androgen medications, computer monitoring, and continued placement on the Megan's Law registry. Without these conditions in place, Dr. Harris conceded that R.Z.B.'s risk of reoffense was "high."
After considering the testimony of the five experts and various exhibits, Judge Freedman concluded in an oral opinion on February 16, 2005 that the State had sustained its burden of proving the requirements for R.Z.B.'s civil commitment under the SVPA. As to the predicate offense required under the statute, the judge determined that R.Z.B. had been convicted of sexually violent crimes in both the New York state courts and in the federal district court.
In his oral ruling, the commitment judge was particularly impressed with the credibility of the State's experts, Drs. Barone and McAllister. The judge also noted that all four of the non-treating experts agreed that R.Z.B. is a pedophile who is highly likely to reoffend. On that score, the judge observed that "I don't think there's any question that [R.Z.B. would be] highly likely to engage in this kind of conduct again if he were to be released within the foreseeable future." Further, the judge characterized R.Z.B. as "highly dangerous," *871 finding that by "clear and convincing evidence, without hesitation."
The judge issued a corresponding order of commitment the following day, February 17, 2005. R.Z.B. appeals.

II.
In his brief on appeal, R.Z.B. raises the following points:
POINT I
THE ATTORNEY GENERAL EXCEEDED HIS STATUTORY AUTHORITY BY INITIATING COMMITMENT PROCEEDINGS AGAINST A CITIZEN OF NEW YORK WHILE THAT CITIZEN WAS IN FEDERAL CUSTODY.
POINT II
THE ATTORNEY GENERAL'S ATTEMPT TO COMMIT R.Z.B. WHILE STILL IN THE FEDERAL CORRECTIONAL INSTITUTION VIOLATED THE INTERSTATE CORRECTION COMPACT.
POINT III
THE TRIAL COURT ERRED BY FINDING THAT THE FEDERAL CRIMES OF WHICH R.Z.B. WAS CONVICTED "SHOULD BE CONSIDERED" SEXUALLY VIOLENT.
POINT IV
BY CONSIDERING THE NEW YORK CONVICTIONS IN 1983 AND 1989 AS PREDICATE OFFENSES, THE TRIAL COURT DEPRIVED R.Z.B. OF FUNDAMENTAL FAIRNESS GUARANTEED BY BOTH FEDERAL DUE PROCESS AND THE NEW JERSEY DOCTRINE OF FUNDAMENTAL FAIRNESS.
POINT V
THE TRIAL COURT ERRED BY RELYING UPON EXPERT OPINIONS THAT WERE THEMSELVES BASED UPON INADMISSIBLE AND UNRELIABLE HEARSAY.
POINT VI
THE TRIAL COURT ERRED BY REFUSING TO CONSIDER CONDITIONAL RELEASE.
POINT VII
THE DEFINITION OF SEXUALLY VIOLENT OFFENSE IN THE ACT EXTENDS THE REACH OF CIVIL COMMITMENT SO FAR AS TO RENDER THE ACT PUNITIVE AND THEREFORE A VIOLATION OF THE CONSTITUTIONAL GUARANTEES AGAINST EX POST FACTO LAWS AND DOUBLE JEOPARDY.
POINT VIII
THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT VIOLATES THE UNITED STATES CONSTITUTION BECAUSE IT FAILS TO PROVIDE FOR TRIAL BY JURY
After fully considering each of these points, we are satisfied that R.Z.B.'s commitment was amply supported by the record and by the controlling law.
An involuntary civil commitment under the SVPA can follow an offender's completion of a sentence, or other criminal disposition, when he or she "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26.
The statute defines a mental abnormality as "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." Ibid. A mental abnormality or personality disorder "must affect an individual's ability to control his or her sexually harmful conduct." In re Civil Commitment of W.Z., 173 N.J. 109, 127, 801 A.2d 205 (2002). A *872 finding of a total lack of control is not necessary. Id. at 126-27, 801 A.2d 205. Instead, a showing of an impaired ability to control sexually dangerous behavior will suffice to prove a mental abnormality. Id. at 127, 801 A.2d 205.
The State must prove at the commitment hearing "a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts . . . by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend." Id. at 132, 801 A.2d 205. The court must address "his or her present serious difficulty with control over dangerous sexual behavior," and the State must establish, by clear and convincing evidence, that it is highly likely that the individual will reoffend. Id. at 132-34, 801 A.2d 205 (emphasis deleted). See also In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 607-08, 845 A.2d 139 (App. Div.2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004); N.J.S.A. 30:4-27.32.
As we have often noted, the scope of appellate review of judgments of civil commitment is exceedingly narrow. We only "reverse a commitment for an abuse of discretion or lack of evidence to support it." In re Civil Commitment of T.J.N., 390 N.J.Super. 218, 225, 915 A.2d 53 (App.Div.2007). See also In re Civil Commitment of V.A., 357 N.J.Super. 55, 63, 813 A.2d 1252 (App.Div.), certif. denied, 177 N.J. 490, 828 A.2d 917 (2003). We have also recognized that "committing judges under the SVPA are specialists in the area, and [that] we must give their expertise in the subject special deference." T.J.N., supra, 390 N.J.Super. at 226, 915 A.2d 53. An appellate court should give the "utmost deference" to the commitment judge's determination of the appropriate balancing of societal interests and individual liberty. In re Commitment of J.P., 339 N.J.Super. 443, 459, 772 A.2d 54 (App.Div. 2001) (citing State v. Fields, 77 N.J. 282, 311, 390 A.2d 574 (1978)). The judge's determination will be subject to modification only where the record reveals a clear abuse of discretion. Ibid. "The appropriate inquiry is to canvass the . . . expert testimony in the record and determine whether the [commitment judge's] findings were clearly erroneous." In re D.C., 146 N.J. 31, 58-59, 679 A.2d 634 (1996).

A.
We first address R.Z.B.'s contentions that the Attorney General exceeded his bounds in initiating steps towards civil commitment while R.Z.B. was confined at Fort Dix and about to be released from that federal institution located in New Jersey. R.Z.B. claims that he is domiciled in the State of New York, and that the Attorney General of New Jersey lacked authority to (1) have him examined by mental health experts before his federal discharge and (2) to thereafter pursue his commitment to the STU in New Jersey under the SVPA. We disagree.
Ordinarily, the Attorney General will learn of the pending release of a confined person who is potentially eligible for civil commitment under the SPVA through one of two statutory mechanisms. First, under N.J.S.A. 30:4-82.4(b), "[w]hen an adult or juvenile inmate is scheduled for release due to [the] expiration of the inmate's maximum term, the [New Jersey] [C]ommissioner [of Corrections] or the Juvenile Justice Commission" is obligated to "notify the Attorney General and the prosecutor of the county from which the person was committed" that the inmate is potentially suitable for civil commitment under the SVPA. Id. The notice must be supplied within ninety days before the inmate's *873 scheduled maximum term is about to expire. N.J.S.A. 30:4-82.4(c). This notice procedure is triggered in the following circumstances where:
(1) The adult inmate's term includes a sentence imposed for conviction of aggravated sexual assault, sexual assault or aggravated criminal sexual contact and the court imposing sentence found that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior;
(2) The parole board or the superintendent of the facility in which the inmate has been confined has advised the commissioner or the Juvenile Justice Commission that the conduct of the inmate during the period of confinement, the inmate's mental condition or the inmate's past history indicates that the inmate may be "in need of involuntary commitment" within the meaning of section 2 of [N.J.S.A.] 30:4-27.2; or
(3) The inmate's term includes a sentence imposed for conviction of a "sexually violent offense" as defined in [N.J.S.A.] 30:4-27.26.
[N.J.S.A. 30:4-82.4(b).]
Additionally, under N.J.S.A. 30:4-27.27, a so-called "agency with jurisdiction" is obligated to give the Attorney General notice of a person who "may meet the criteria of a sexually violent predator" ninety days prior to:
(1) the anticipated release from total confinement of a person who has been convicted of or adjudicated delinquent for a sexually violent offense;
(2) any commitment status review hearing at which the Department of Human Services intends to recommend discharge or believes that discharge may be likely, for a person who has been civilly committed pursuant to [N.J.S.A.] 2C:4-8 following acquittal by reason of insanity for a sexually violent offense; or
(3) any hearing at which the Department of Human Services intends to recommend discharge or believes that discharge may be likely, for any person civilly committed based upon a determination that the person lacked mental competence to stand trial pursuant to [N.J.S.A.] 2C:4-6, if the person had been charged with a sexually violent offense.
[N.J.S.A. 30:4-27.27(a).]
For purposes of this particular section, N.J.S.A. 30:4-27.26 defines "agency with jurisdiction" as follows:
"Agency with jurisdiction" means the agency which releases upon lawful order or authority a person who is serving a sentence or term of confinement, or is otherwise being detained or maintained in custody. This term includes the Department of Corrections or a county correctional facility, the Juvenile Justice Commission or a county juvenile detention facility, and the Department of Human Services.
[N.J.S.A. 30:4-27.26]
We are mindful that federal correctional institutions are not specifically mentioned in the notice provisions of N.J.S.A. 30:4-82.4(b), or of N.J.S.A. 30:4-27.27. Nonetheless, we are supplied with no supporting legislative history, or with any sound reason, to treat federal agencies that house sexually violent persons within our State's borders as beyond the legislatively-intended ambit of the SVPA commitment process. In particular, we are not convinced that such federal agencies are ineligible to give notice[5] to the Attorney General under *874 the SVPA of a sexual offender's pending release or that they may not permit the Attorney General to have such an inmate examined by appropriate experts.
With particular respect to N.J.S.A. 30:4-27.27, we note that the concept of an "agency with jurisdiction" is defined with broad, unqualified terminology. The definition covers an "agency which releases upon lawful order or authority" a person who is "serving a sentence or term of confinement, or is otherwise being detained or maintained in custody." N.J.S.A. 30:4-27.26 (emphasis added). Clearly, the Federal Bureau of Prisons had "lawful authority" to confine R.Z.B. at Fort Dix, pursuant to the federal sentencing judge's disposition of R.Z.B.'s parole violation. R.Z.B. was indisputably serving "a sentence" at Fort Dix, and was "being detained or maintained in custody" there. Ibid.
Although N.J.S.A. 30:4-27.26 lists various State institutions as "include[d]" within the notion of an "agency with jurisdiction," that illustrative listing does not exclude other possibilities such as federal agencies. See In Re Adoption of Children by G.P.B., Jr., 161 N.J. 396, 406, 736 A.2d 1277 (1999) (observing that the use of the word "include" before a statutory listing "demonstrates that the list is not exhaustive"); see also Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965) (noting that "include" is normally used as a word of enlargement, not limitation).
To be sure, under principles of federal supremacy, the New Jersey Legislature could not mandate federal officers to supply notifications to the State Attorney General. See First Jersey Securities, Inc. v. Sec. and Exch. Comm'n., 194 N.J.Super. 284, 294, 476 A.2d 861 (App.Div.1984), appeal dismissed, 101 N.J. 208, 501 A.2d 893 (1985); see also U.S. Const. art. VI, c1.2. By no means, however, does the supremacy doctrine prevent federal agencies from cooperatively working with their state counterparts and, on their own initiative, either alerting those counterparts that a potentially violent sexual predator is about to be released or giving those state agencies access to examine a federal prisoner.
Moreover, as a notice statute, N.J.S.A. 30:4-27.27 disclaims any jurisdictional pretense. It specifically recites in subsection (e) that a "failure to comply" with the notice procedures "in no way prevents the Attorney General from initiating a proceeding [under the SVPA]." N.J.S.A. 30:4-27.27(e). Thus, even if the notice to the Attorney General here was somehow flawed, which we think was not the case, the Attorney General would still have the power to initiate SVPA commitment proceedings against R.Z.B.
The Attorney General maintains residual power to seek commitment under the SVPA of persons who are not presently incarcerated or otherwise confined. In re Civil Commitment of P.Z.H., 377 N.J.Super. 458, 465, 873 A.2d 595 (App. Div.2005); see also N.J.S.A. 30:4-27.28(b) (generally authorizing the Attorney General to seek the psychiatric evaluation of a person where "there is reasonable cause to believe that the person . . . is a sexually violent predator"). Ultimately, it is inconsequential how the Attorney General learned of R.Z.B.'s pending release, for the Attorney General would have had the right to have R.Z.B. examined if he were residing *875 as a civilian in New Jersey and the other statutory preconditions to such an examination were met.
R.Z.B. emphasizes the lack of a specific Interstate Correctional Compact provision providing for either (1) notice of the pending release of federal inmates housed within the State who have sexually violent characteristics or (2) confirming that a federal inmate can be transferred, upon completion of his federal sentence, to the New Jersey unit for sexually violent predators. We acknowledge that no such specific or other formal inter-governmental agreement has been identified to us in the briefs, and we have not uncovered such a provision in our own research. See N.J.S.A. 30:7C-1 et seq. (reciting the terms of the Interstate Corrections Compact, which treats the Federal government as a member "state"). However, we again perceive no impediment to the federal correctional authorities choosing to work cooperatively with state authorities to assure the safety of the public. Indeed, such cooperation was sensibly pursued here to assure that R.Z.B. would be clinically evaluated before he was potentially released back into society.
Under some circumstances, federal law mandates notification of a sex offender's pending release from a federal prison. In particular, 18 U.S.C.A. § 4042(c) requires the Federal Bureau of Prisons, at least five days prior to a sex offender's release, to alert "the chief law enforcement officer of the State and of the local jurisdiction in which the person will reside" and "a State or local agency responsible for the receipt or maintenance of sex offender registration information in the State or local jurisdiction in which the person will reside." 18 U.S.C.A. § 4042(c)(1)(A) and (B) (emphasis added).
R.Z.B. professes that he intended to reside in the State of New York, to assist his elderly mother, upon his discharge from federal custody for his parole violation. That intention is not consistently established by the record, given R.Z.B.'s earlier purchase of a home in Bayonne, New Jersey, his subsequent residency in Union City, New Jersey consistent with the terms of his parole, and his underlying criminal conduct in bringing male youths from New York to New Jersey. The record also does not indicate whether the Bureau of Prisons gave notice of R.Z.B.'s release to authorities in the State of New York, a circumstance that might have bolstered R.Z.B.'s present arguments of his intended domicile.
In any event, even if 18 U.S.C.A. § 4042(c) did not require the Bureau of Prisons to give notice of R.Z.B.'s pending release to the Attorney General of New Jersey, nothing in that statute precludes the Bureau from affording the Attorney General such notice or cooperation voluntarily as a precautionary measure. Given R.Z.B.'s sustained presence in New Jersey, in and out of confinement, since 2002 and his numerous ties to New Jersey,[6] it would not strain the imagination if he had chosen to remain within the State's borders after his release from Fort Dix, notwithstanding his prior residency in New York.
R.Z.B. further argues that his civil commitment under the SVPA is inconsistent with the expectations of the federal district judge who had sentenced him for his federal crimes. In this regard, R.Z.B. points to the district judge's May 14, 2004 *876 letter, which expressed the judge's perception that R.Z.B. "did not pose any danger to under-age persons" and that his "sexual orientation was being directed into appropriate channels." However, as R.Z.B.'s counsel acknowledged before us at oral argument, the federal judge did not possess, when he transmitted his letter, the adverse results of the mental health evaluations conducted in 2004 by Dr. Barone and Dr. McAllister, nor the defense experts' reports largely confirming his present abnormal diagnoses.
Although we respectfully appreciate the district judge's observations based upon the information he gleaned about R.Z.B. in the federal proceedings, those observations are not binding in the separate context of R.Z.B.'s subsequent proceedings under the SVPA. The district judge recognized as much, by explicitly advising R.Z.B. that the "proceedings which the State of New Jersey brought against you are not within my [federal] jurisdiction."
Further, we note that R.Z.B. does not identify any provision within an order from the federal court concerning the terms of his sentence and parole that are expressly violated by the State's civil commitment of R.Z.B. under the SVPA after he was released from federal custody. Although we might envision substantial jurisdictional or legal issues in the hypothetical circumstance where a federal judge's order directly clashes with a state court's order under the SVPA, no such conflict is truly present here.
In sum, we reject R.Z.B.'s various arguments that the Attorney General exceeded his respective powers by having R.Z.B. evaluated at Fort Dix and initiating civil commitment proceedings. We likewise reject R.Z.B.'s claim that the trial judge exceeded his own authority in concluding that R.Z.B. is in need of commitment and treatment and ordering his placement at the STU.

B.
R.Z.B. also challenges the trial judge's determination that he has been convicted of predicate crimes eligible for commitment under the SVPA. This argument is likewise unpersuasive.
In order for a person to be deemed a sexually violent predator under the SVPA, that person must have been previously convicted, adjudicated delinquent, or found not guilty by reason of insanity of a "sexually violent offense," or declared incompetent to stand trial for such an offense. N.J.S.A. 30:4-27.26. As defined by the statute, a "sexually violent offense" includes the enumerated offenses of aggravated sexual assault, sexual assault, aggravated criminal sexual conduct, criminal sexual conduct, certain forms of kidnapping and felony murders, and attempts to commit those enumerated crimes. N.J.S.A. 30:4-27.26(a). The statutory definition also covers "a criminal offense with substantially the same elements" as any of these enumerated offenses, "entered or imposed under the laws of the United States, this State, or another State." Id. Alternatively, a "sexually violent offense" pertains to "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." N.J.S.A. 30:4-27.26(b).
R.Z.B. argues that the federal offenses for which he was convicted do not qualify as predicate convictions under the SVPA. His federal crimes were the sexual exploitation of children; the interstate transportation of child pornography; the receipt, distribution and reproduction of child pornography; the possession of child pornography; and conspiracy. R.Z.B. contends *877 that none of those federal crimes is violent in nature, or tantamount to the sexually violent predicate crimes enumerated in N.J.S.A. 30:4-27.26(a). He also emphasizes that the federal sentencing judge, who was generally unimpressed with much of the Government's trial evidence against R.Z.B., made no "specific finding on the record" that R.Z.B. had committed what should be considered a sexually violent offense.[7]
The State, in turn, argues that R.Z.B.'s federal convictions are indeed within the range of "sexually violent" predicate acts covered by the SVPA. The State contends that R.Z.B.'s commission of child pornography offenses and other federal crimes have characteristics of exploitation in common with the offenses enumerated in the SVPA. The State notes in this regard that the federal judge at R.Z.B.'s sentencing observed on the record R.Z.B.'s "sexual compulsion and exploit[at]ive nature." The State does not contend that child pornography is, in every context, a sexually violent crime, but submit that the particular context of the pornography in this case warrants that conclusion.
We need not resolve these particular arguments, because we find that R.Z.B.'s two prior convictions in the State of New York qualify as predicate acts for SVPA commitment. In particular, we are satisfied that R.Z.B.'s prior convictions in New York for what that jurisdiction used to describe as "sodomy," see N.Y. Penal Law § 130.45, correspond sufficiently to sexual assaults proscribed under New Jersey law and qualifying as predicate offenses under the SVPA. In this regard, we note that R.Z.B.'s first sodomy conviction in New York arose out of making underage boys participate in acts of oral sex on several occasions. His subsequent New York conviction for sodomy likewise arose out of inducing numerous young males to take part in oral sex. These cognate offenses in another state readily satisfy the SVPA.
Although we recognize that R.Z.B.'s New York offenses occurred in the 1980's, the passage of time does not eliminate their legal significance as eligible prior convictions under the SVPA. In re Civil Commitment of P.Z.H., supra, 377 N.J.Super. at 465-66, 873 A.2d 595 (finding that the date of the last predicate act is not relevant where there is clear and convincing evidence that the defendant "currently presents a high likelihood of committing sexually violent acts"). The passage of time is instead germane to the offender's present mental health assessment, which was closely scrutinized by the five experts who testified at R.Z.B.'s commitment hearing.
We therefore affirm, albeit on more limited grounds, the trial judge's determination that R.Z.B. had been convicted of one or more sexually violent offenses qualifying under the SVPA.

III.
[Part III, which rejects as unmeritorious other separate and discrete points that R.Z.B. raises on appeal, has been redacted from this published opinion at the court's direction. See R. 1:36-2(d).]
Affirmed.
NOTES
[1] The record varies as to the reported dates of birth for R.Z.B. For purposes of this opinion, we assume his date of birth is October 13, 1948, which appears on his New York driver license.
[2] Even though he pled guilty to these offenses, R.Z.B. presently only admits to the second offense, acknowledging that he might have touched the nine-year old inappropriately.
[3] The State of New Jersey filed criminal charges against R.Z.B. for several of these acts, but those charges were withdrawn after federal charges were brought against him for the same conduct.
[4] A copy of that letter is not supplied in the record.
[5] The Attorney General's brief contends, without supporting documentation, that the Attorney General learned of R.Z.B.'s pending release from Fort Dix from the Hudson County Prosecutor's Office. The record is unclear whether the Bureau of Prisons ever notified the county prosecutor of R.Z.B.'s anticipated release or, alternatively, whether the Bureau or federal security personnel simply acquiesced in providing the Attorney General with access to have R.Z.B. examined.
[6] Although not essential to our analysis, we note that R.Z.B.'s nexus to New Jersey is strengthened by the fact that he had been sentenced by a federal judge in New Jersey and not from some other federal district.
[7] Among other things, the sentencing judge found the Government's informant lacked credibility, and the judge also expressed doubts concerning "the fairness and objectivity" of the undercover detective who had prompted R.Z.B. to transport the incriminating pornographic slides. In a subsequent habeas corpus proceeding, two youths who had testified at the federal trial recanted. Nevertheless, R.Z.B. has obtained no relief from his federal convictions, and those convictions remain valid.