Justice PATTERSON,
dissenting.
When it enacted the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38, the Legislature sought to protect potential victims from harm while also safeguarding the due process rights of sexual offenders. Given the deprivation of liberty that follows civil commitment under the statute, the SVPA authorizes courts to civilly commit an individual only if the State proves by clear and convincing evidence that the individual is a “sexually violent predator” who, if released into the community, would be “highly likely” to sexually reoffend. N.J.S.A. 30:4-27.26; N.J.S.A. 30:4-27.32(a); In re Civil Commitment of W.Z., 173 N.J. 109, 132, 801 A.2d 205 (2002). The trial court’s determination “should be modified only if the record reveals a clear mistake.” In re D.C., 146 N.J. 31, 58, 679 A.2d 634 (1996).
In my view, as in the opinion of the Appellate Division panel, the record of this case reveals a clear mistake. With due respect for the seasoned judge who presided over the commitment hearing, the testimony presented to her simply does not support her conclusion that R.F. is not a sexually violent predator. Even if we disregard the compelling testimony of the State’s expert witnesses that R.F. poses a significant risk to the public, and R.F.’s self-described “deviant arousal” for preteen girls and the sight of blood, the testimony of R.F.’s own expert establishes the risk imposed by R.F.’s impending release. R.F.’s expert conceded that *184 R. F. has a psychiatric condition that meets the clinical definition of antisocial personality disorder. R.F.’s expert opined that by virtue of a cognitive impairment, R.F. considered himself a peer of the twelve- and thirteen-year-old victims of his offenses—prompting him to perceive sexual contact with a child to be tantamount to adult dating behavior, rather than criminal assault. R.F.’s expert provided no assurance that R.F. can successfully navigate an independent existence in the community, and strongly suggested that he cannot. Nonetheless, the trial court ordered his release.
I respectfully submit that, notwithstanding the deferential standard to which the trial court’s factual findings are entitled, the court’s ruling in this case should not survive appellate review. The Appellate Division panel did not substitute its judgment for that of the trial judge, but did what an appellate court is intended to do: provide a careful review of the evidence in accordance with the statutory mandate and the compelling public safety interest at stake. The panel tested the trial court’s determination against the record before it, and unanimously found that determination to be contrary to the evidence.
I would affirm the panel’s judgment, and would authorize the continued civil commitment of R.F., subject to annual review as required by N.J.S.A 30:4-27.35.1 respectfully dissent.
I.
The record before the trial court should be viewed in the context of the Legislature’s purpose when it enacted the SVPA. The Legislature recognized that violent sexual offenders “suffer from mental abnormalities or personality disorders which make them likely to engage in repeat acts of predatory sexual violence if not treated for their mental conditions.” N.J.S.A. 30:4-27.25(a). As this Court has noted, “[t]he Legislature enacted the SVPA to protect other members of society from the danger posed by sexually violent predators.” In re Civil Commitment of J.M.B., 197 N.J. 563, 570-71, 964 A.2d 752, cert, denied, 558 U.S. 999, 130 S. Ct. 509, 175 L.Ed.2d 361 (2009); see also W.Z., supra, 173 N.J. *185 at 132, 801 A.2d 205 (stating that “[t]o be committed under the SVPA an individual must be proven to be a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts”). The Legislature foresaw the risks posed by sexually violent predators and the shortcomings of the existing procedure for involuntary commitment to address those risks. supra, 197 N.J. at 571, 964 A.2d 752.
In that setting, the Legislature “broaden[ed] the reach of New Jersey law to afford protection to society from those sexually violent predators who pose a danger as a result of a mental abnormality or personality disorder which makes them likely to engage in repeated acts of predatory sexual violence.” In re Civil Commitment of E.D., 353 N.J.Super. 450, 456, 803 A.2d 166 (App.Div.2002); see N.J.S.A. 30:4-27.25(b)-(c) (stating that in light of shortcomings in existing involuntary commitment procedures, “it [was] necessary to modify the involuntary civil commitment process in recognition of the need for commitment of those sexually violent predators who pose a danger to others should they be returned to society”).
To be involuntarily committed under the SVPA, an individual must be adjudged a “sexually violent predator,” defined as “a person who has been convicted ... of a sexually violent offense” and who “suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.” N.J.S.A 30:4-27.26; N.J.S.A. 30:4-27.32(a). The Legislature defined “[l]ikely to engage in acts of sexual violence” to mean “the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others.” N.J.S.A. 30:4-27.26.
As the majority notes, at an SVPA civil commitment hearing, the State is required to prove by clear and convincing evidence three elements derived from the SVPA and case law. Ante at 173, 85 A.3d at 991. First, the State must prove that the individual has been convicted of one or more of the sexually violent offenses *186 enumerated in the statute, or “any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person’s offense should be considered a sexually violent offense.” N.J.S.A 30:4-27.26; see W.Z., supra, 173 N.J. at 127, 801 A.2d 205.
Second, the State must prove that the individual “suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence” unless he or she is confined. N.J.S.A. 30:4-27.26; W.Z., supra, 173 N.J. at 130, 801 A.2d 205. “A finding of mental abnormality that results in an impaired but not a total loss of ability to control sexually dangerous behavior” may suffice; the State need not demonstrate “a total lack of capacity to control such dangerous behavior.” W.Z., supra, 173 N.J. at 126-27, 801 A.2d 205.
Finally, the State must prove that the individual poses a threat to the health and safety of others, which is established upon proof by clear and convincing evidence that he or she has “serious difficulty in controlling his or her harmful behavior such that it is highly likely that [he or she] will not control his or her sexually violent behavior and will reoffend.” Id. at 130, 801 A.2d 205. This Court has explained that the court’s findings regarding the threat of recidivism:
incorporate a temporal sense that will require an assessment of the reasonably foreseeable future. No more specific finding concerning precisely when an individual will recidivate need be made by the trial court. Commitment is based on the individual’s danger to self and others because of his or her present serious difficulty with control over dangerous sexual behavior.
[Id. at 132-33, 801 A.2d 205.]
That determination requires the court to carefully scrutinize the testimony of the expert witnesses presented by the State and the individual who is the subject of the hearing. Prior to the enactment of the SVPA, this Court noted that in the context of a commitment hearing, the determination of a violent sex offender’s dangerousness is “a legal one, not a medical one, even though it is guided by medical expert testimony.” D.C., supra, 146 N.J. at 38, 59, 679 A.2d 634. In making that determination, the court must *187 carefully balance the safety of the public against the individual’s liberty interests. Id. at 59, 679 A.2d 634.
Civil commitment under the SVPA is not indefinite. Rather, the reviewing court holds an annual hearing to determine whether the “involuntary commitment of a sexually violent predator shall be continued,” imposing on the State the burden of proving the statutory elements by clear and convincing evidence. N.J.S.A. 30:4-27.35. A trial court’s denial of the State’s motion for civil commitment pursuant to the SVPA has immediate consequences for that individual and for the public. Under the terms of the SVPA, the individual must be released “within 48 hours ... or by the end of the next working day, whichever is longer,” N.J.S.A. 30:4-27.32(b), with a discharge plan prepared under N.J.S.A. 30:4-27.37, and notice to law enforcement and victims to the extent required by N.J.S.A. 30:4-27.38.
Charged with protecting the public from violent sexual predators, and safeguarding the due process rights of the individual under review, the judiciary plays a crucial role in the application of the SVPA. A critical component of that role is a thorough and rigorous appellate review. Our appellate courts recognize the specialized expertise of the commitment court, and will reverse that court’s determination only upon “an abuse of discretion or a lack of evidence to support it.” In re Civil Commitment of T.J.N., 390 N.J.Super. 218, 225-26, 915 A.2d 53 (App.Div.2007); accord In re Civil Commitment of R.Z.B., 392 N.J.Super. 22, 35-36, 919 A.2d 864 (App.Div.2007). “ ‘The appropriate inquiry is to canvass the ... expert testimony in the record and determine whether the [commitment judge’s] findings were clearly erroneous.’ ” R.Z.B., supra, 392 N.J.Super. at 36, 919 A.2d 864 (alteration in original) (quoting D.C., supra, 146 N.J. at 58-59, 679 A.2d 634). Nonetheless, appellate review of an SVPA determination entails scrutiny of the evidence before the trial judge, and a determination of whether the judge’s findings are supported by that evidence. See Curtis v. Finneran, 83 N.J. 563, 570, 417 A.2d 15 (1980) (stating in context of nonjury civil action, “the trial court must state clearly *188 its factual findings and correlate them with the relevant legal conclusions”); In re Civil Commitment of J.P., 393 N.J.Swper. 7, 17, 922 A.2d 754 (App.Div.2007) (stating in context of trial court’s determination that defendant’s underlying sexual conduct constituted predicate sexual offense under SVPA, “[tjrial judges must understand that the requirement to articulate specific findings ... is essential to meaningful review of the record”). In short, given the competing interests at stake, appellate review of an SVPA determination must be conducted with precision and care.
II.
In my view, the Appellate Division panel properly identified this case as the rare instance in which the trial court’s findings lack a firm foundation in the record, warranting reversal.
The trial court’s task was to determine three issues: (1) whether R.F. had been convicted of a sexually violent offense; (2) whether R.F. suffered from a mental abnormality or personality disorder; and (3) whether as a result of that abnormality or disorder, it is highly likely that R.F. will not control his sexually violent behavior, and that he will reoffend. N.J.S.A. 30:4-27.26; W.Z., supra, 173 N.J. at 127-33, 801 A.2d 205. The trial court found that the State had proven by clear and convincing evidence the first and second elements—that R.F. had been convicted of a predicate offense as defined by the SVPA, and that he suffered from a mental abnormality or personality disorder within the meaning of N.J.S.A. 30:4-27.26. Accordingly, the trial court’s denial of the State’s application for civil commitment was premised on a single determination: that the State had failed to meet its burden of proving by clear and convincing evidence that by virtue of his recognized mental abnormality or personality disorder, R.F. is highly likely to reoffend.
Like the Appellate Division panel, I am persuaded that the State presented clear and convincing evidence—indeed, overwhelming evidence—that R.F. is a sexually violent predator who is highly likely to engage in acts of sexual violence after his release. *189 My conclusion is not premised upon the differences between the opinions offered by the various experts, but upon their common ground. While it diverged to some extent from the expert opinions offered by the State, the testimony of R.F.’s expert witness confirmed the State’s evidence in significant respects, and in my view supported R.F.’s continued confinement, not his release. I respectfully submit that the trial court’s conclusion that the State had failed to meet its burden under the SYPA is contrary to the evidence, and is premised upon reasoning that is simply irrelevant to the SVPA.
As the majority recounts, the State’s expert psychiatrist, Dr. Robert Harris, diagnosed R.F. with pedophilia, attention-deficit hyperactivity disorder (ADHD) and antisocial personality disorder. The expert’s diagnoses were premised in part upon his interviews with R.F. In those interviews, R.F. admitted that he began to be attracted to one victim when she was ten years old. R.F. also told the expert on multiple occasions that he had a “deviant arousal” for girls aged between ten and thirteen, and that he was also aroused by images of blood. Dr. Harris testified that the combination of pedophilia and anti-social personality disorder greatly exacerbated R.F.’s risk of reoffense. Acknowledging that the Static-99 diagnostic tool should be used with caution to assess juvenile offenders, Dr. Harris nevertheless relied upon it, given that R.F. was almost eighteen years old at the time of his offense. By Dr. Harris’s assessment, R.F.’s Static-99 scores of four and five meant that he presents a moderate to high risk of sexually reoffending.
Dr. Harris noted that R.F. may identify himself with young children or perceive them to be his peers. He considered this factor to heighten, rather than mitigate, R.F.’s risk of reoffending if released from civil commitment. The expert was further concerned by R.F.’s sexual activity during his confinement, finding that this denoted R.F.’s inability to comply with rules and regulations. Ultimately, Dr. Harris concluded that R.F. presented a high risk of reoffense.
*190 The State’s second expert witness, psychologist Dr. Sean McCall, did not concur with Dr. Harris’s definitive diagnosis of pedophilia in R.F. Instead, Dr. McCall adopted a provisional diagnosis of “rule out pedophilia,” as well as a diagnosis of antisocial personality disorder. Dr. McCall opined that R.F. had admitted that he was sexually aroused by young girls, and noted R.F.’s willingness to “act upon” that arousal. Dr. McCall described R.F.’s escalating sexual violence and deviance, noting his use of force against the first victim and his use of a weapon against the second. Like Dr. Harris, Dr. McCall relied upon the Static-99 test given R.F.’s near-adult status at the time of his offenses and the nature of those offenses. The expert determined R.F.’s Static-99 score to be a four, which he equated to a thirty-six percent chance of being reconvicted for a sexual offense within fifteen years. Dr. McCall shared Dr. Harris’s concern that R.F.’s continued inability to refrain from sexual activity while confined indicated that he could not comport himself to the restrictive standards of commitment, much less the standards of society. Dr. McCall found that R.F.’s diagnosis of antisocial personality disorder predisposed him to reoffend. Dr. McCall concluded that R.F. was at a high risk to sexually reoffend if not committed. During his cross-examination, Dr. McCall expressed the same concern as Dr. Harris regarding R.F.’s emotional identification with children, concluding that it increased the risk of R.F. reoffending sexually.
Dr. Vivian Schnaidman, an expert in psychiatry, testified on behalf of R.F. Dr. Shnaidman diagnosed R.F. with conduct disorder. She initially characterized his condition as a juvenile manifestation of antisocial personality disorder, but conceded under questioning from the trial judge that R.F.’s mental condition met the Diagnostic and Statistical Manual of Mental Disorders criteria [1] for antisocial personality disorder. She stated that because R.F. had conduct disorder, “there is definitely psychopathology, I just don’t want it to be sexual psychopathology.” Dr. Shnaidman *191 rejected the use of the Static-99 diagnostic test because of R.F.’s age and cognitive limitations, and opined that despite his mental conditions, R.F. is at a low risk to reoffend.
Dr. Shnaidman emphasized R.F.’s belief that his young victims, who had accepted him as someone with whom they could play “hide-and-seek,” were in fact his peers. She testified that in concert with R.F.’s cognitive impairment, this belief caused him to equate his sexual assaults on his twelve and thirteen year old victims to adult dating behavior. Although she conceded that children of these victims’ ages may not, as a matter of law, consent to sexual activity, Dr. Shnaidman suggested that R.F. believed that the victims were his contemporaries, and therefore were capable of giving consent. Dr. Shnaidman acknowledged R.F.’s interaction with the victims prior to the assaults, which had been characterized by the State’s experts as R.F.’s “grooming” of the victims. She minimized the significance of those interactions, observing that if such contact took place between adult men and adult women, it would be called “dating.” Dr. Shnaidman testified that in R.F.’s mind, his sexual encounters with his young victims constituted “dating.”
Dr. Shnaidman testified regarding R.F.’s plea bargain, pursuant to which R.F. had pled guilty to two charges of third-degree endangering the welfare of a minor, N.J.S.A. 2C:24-4(a), rather than the more serious charges pending against him, two counts of first-degree aggravated sexual assault N.J.S.A. 2C:14-2(a)(4). To Dr. Shnaidman, the State’s decision to enter into the plea bargain indicated that R.F.’s conduct, contrary to statements from his victims indicating R.F.’s use of force and weapons, fell somewhere on the spectrum between consensual sexual activity and sexual activity conducted through the use of force. Dr. Shnaidman opined that R.F. had learned from his mistakes and now understood that he would not be protected from prosecution because he was not yet eighteen when these offenses were committed.
Thus, while the expert witnesses who testified before the trial court disagreed on significant points, there was substantial con *192 sensus among them. All of the experts agreed that R.F.’s mental condition met the DSM-IV-TR criteria for antisocial personality-disorder. All of the experts agreed that R.F. misidentified children as his peers and that he has had sexual encounters with minors. All of the experts recognized that R.F. had likely been sexually active, in violation of facility rules, while confined.[2] None of the experts remotely suggested that following his offenses, R.F. gained the ability to control the arousal that is prompted by his contact with children. Indeed, the very explanation that Dr. Shnaidman offers in R.F.’s defense—that R.F.’s mental condition rendered him incapable of understanding that he is not the contemporary of a pubescent girl, or of distinguishing between the sexual assault of a child and adult dating behavior—itself raises serious concerns.[3]
In my view, the trial court’s analysis of the record fails to support its conclusion. The court cited factors that would tend to exacerbate, not reduce, the risk of recidivism: R.F.’s disciplinary record and lack of significant progress while confined, his poor impulse control, his limited ability to comprehend that he had committed sexual offenses and what the trial judge described as his “bizarre” statements about being aroused by young girls and blood. The trial judge noted discrepancies between R.F.’s narra *193 tive of the two incidents that led to his conviction for endangering the welfare of a child and the official record. She observed that R.F. had received numerous disciplinary citations while confined, including one involving suspected sexual activity with another resident of the facility, that he claimed to have another personality that he termed “Goliath,” that he reported experiencing blackouts, that he demonstrated what the court termed “distorted thinking,” and that “he had only a limited understanding of his crime.” The judge found evidence in the expert testimony and in R.F.’s treatment records that R.F. is significantly cognitively impaired. She noted that R.F. made only limited progress in treatment, that he had been diagnosed with attention deficit hyperactivity disorder and bipolar disorder and that he suffered from juvenile conduct disorder. The trial judge stated that based upon R.F.’s past conduct, it could be reasonably predicted that “he will get in trouble if released now into the community.”
Nonetheless, the trial judge stated that she was “not so clearly convinced” that R.F. was “highly likely to commit a sexually violent offense in the foreseeable future.” That conclusion was not based upon any expert testimony indicating that R.F. has made progress with treatment and time. Instead, the trial judge focused upon a factor recognized nowhere in the SVPA or in the case law applying it: the terms of defendant’s plea bargain. The trial judge conjectured that the prosecutor’s decision to permit R.F. to plead guilty to a lesser included offense, rather than to try him for first-degree aggravated sexual assault, revealed that the State had doubts about the underlying offenses. She stated: *194 In fact, the record reveals nothing whatsoever about the reason why the State entered into a plea agreement with R.F.; like any other plea bargain, the agreement in this case may have been influenced by a range of factors. Further, the trial judge’s suggestion that R.F.’s civil commitment is akin to a life sentence is belied by the statute’s requirement that R.F.’s commitment be reviewed annually, pursuant to N.J.S.A. 30:4-27.35. I respectfully submit that the trial court’s reliance upon speculation about R.F.’s plea bargain and erroneous assumptions regarding his term of commitment constituted significant errors, and led the court to the wrong decision.
*193 The Sussex County Prosecutor’s Office and the sentencing Judge are those more closely connected to [R.F.’s] sexual offending behavior and most capable of making an evaluation of appropriate sanctions punitive and remedial. Rather than pursue child rape convictions possible here with a presumptive 30-year sentence, the two offenses were pled out as third-degree endangering charges ... with concurrent sentences of five years at [the Adult Diagnostic and Treatment Center]. The State’s petition now seeks civil commitment to [the] Special Treatment Unit with an indeterminate time which in this case is tantamount to life in custody. This disproportion itself raises doubts in this Court’s mind.
*194 The Appellate Division panel did not, as the majority suggests, substitute its judgment for that of the trial court in drawing inferences from a debatable record. Instead, the panel properly concluded that the trial court’s analysis lacked support in the evidence, and that it accordingly could not withstand even a deferential appellate review. In my view, the panel furthered the Legislature’s goals that violent sexual offenders be ensured due process and provided treatment, and that public safety—in this case the safety of children—be preserved.
I do not share the majority’s confidence that R.F.’s release with a discharge plan, with the restrictions imposed by community supervision for life (CSL) under N.J.S.A. 20:43-6.4, will protect the community.[4] The restrictions of CSL cited by the majority— requiring R.F. to seek authorization regarding his residence and employment, to contact his parole officer for various reasons, to submit to drug, alcohol and psychological testing and to complete *195 treatment—can provide effective protection to the public and adequate supervision for certain offenders released from SVPA confinement. I submit, however, that R.F. is not such an offender, and this is not such a case. Given R.F.’s previous failure to make progress in treatment, his violation of rules regarding sexual activity even while confined, his documented inability to control his sexual impulses and his history of violence, the restrictions imposed as part of CSL provide scant protection to potential victims, especially children whom R.F. may encounter. Particularly in light of R.F.’s own expert’s opinion that his identification with children led him to confuse sexual activity with minors with adult dating, there is no assurance that he would comply with a ban on contact with his victims or other minors, and a strong suggestion that he would not. In my view, CSL restrictions are simply inadequate to protect the community from the risk that R.F. will reoffend.
I respectfully submit that a substantial error was made when the trial court denied the State’s motion to civilly commit R.F. under N.J.S.A. 30:4-27.32(a). I would affirm the Appellate Division’s determination, and I respectfully dissent.
For reversal/reinstatement/remandment—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—5.
For affirmance■—Justice PATTERSON—1.

 American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 706 (4th ed. Text Revision 2000) (DSM-JCV-TR).

 Dr. Shnaidman testified that she asked R.F. whether he continued to be sexually active while in confinement but that he denied it and informed her that he was uncomfortable discussing anything sexual with her. Dr. Shnaidman agreed that R.F. was likely sexually active while confined, but stated that "the fact that he may have had sexual activity with one or two peers in this facility, it’s not—for me it’s not a deal breaker."

 I am not reassured, as is the majority, by R.F.’s purported understanding "that it is wrong to have sexual relations with underage individuals." Ante at 181, 85 A.3d at 996. During cross-examination, R.F.’s expert Dr. Shnaidman explained that while R.F. believed that his victims consented to sexual activity and that one of his victims was in fact his girlfriend, he still felt remorse because he was criminally charged and convicted. She testified that, ”[t]he details of exactly how and why it was wrong may still remain muddled in his mind, but he knows that it was wrong and he would take it back if he could because he feels bad that he did something bad.”

 The "conditional discharge” cited by the majority, ante at 181, 85 A.3d at 995-96, is unavailable in this case. Such a discharge is authorized by the SVPA only "[i]f the Department of Human Services recommends conditional discharge of the person and the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person." N.J.S.A. 30:4-27.32(c)(1). No such finding has been made with respect to R.F.