# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0328-17T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.C.,

    Defendant-Appellant,

and

A.W.C., SR.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF A.W.C., JR.,

    a Minor.

_____

        Submitted May 10, 2018 – Decided June 19, 2018

        Before Judges Simonelli and Gooden Brown.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Monmouth
        County, Docket No. FG-13-0050-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Phuong Dao, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Rachel Simone Frey, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Charles Ouslander, Designated Counsel, on the brief).

PER CURIAM

Defendant A.C.[1] appeals from the September 5, 2017 judgment of guardianship that terminated her parental rights to her son, A.W.C., Jr., born in November 2012.[2] Defendant contends that plaintiff New Jersey Division of Child Protection and Permanency (Division) failed to prove each prong of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supported termination before the trial court and, on appeal, joins the Division in urging us to affirm. Having considered the parties' arguments in light of the record and applicable legal standards, we affirm.

---

[1] Pursuant to Rule 1:38-3(d), we use initials to protect the confidentiality of the participants in these proceedings.

[2] The judgment of guardianship also terminated the parental rights of A.W.C., defendant's husband and A.W.C., Jr.'s biological father. However, he does not participate in this appeal.

2                                                      A-0328-17T3

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm[3] . . . ;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

On January 4, 2017, the Division filed a verified complaint to terminate defendant's parental rights and award the Division guardianship of A.W.C., Jr. Judge Stephen J. Bernstein conducted a four-day guardianship trial during which the Division and defendant each presented four witnesses. In addition, numerous documentary exhibits were admitted into evidence.

---

[3] "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2).

We will not recite in detail defendant's extensive history of substance abuse and mental health issues that has plagued her, resulted in multiple hospitalizations for attempted suicide, and led to her involvement with the Division as an adult since 2009.[4] Defendant's lengthy involvement with the Division has generated numerous court orders compelling her to comply with substance abuse treatment, psychiatric care for bi-polar disorder and post-traumatic stress disorder, medication monitoring, and safety protection plans. Suffice it to say that the guardianship complaint that is the subject of this appeal followed the emergency removal of A.W.C., Jr. in March 2014, when A.W.C., Jr.'s paternal grandparents discovered drug paraphernalia in the upstairs apartment of their split level home, where defendant had been residing with their son and grandson, and ejected the couple from their home. Earlier drug screens administered to defendant at the Division's request were positive for heroin, cocaine and morphine.

_____

[4] Defendant has two older children, neither of whom was still in her care. In 2009, the Division removed the younger child, born in June 2009, from her care due to her non-compliance with mental health treatment. He was later adopted by his maternal grandmother in 2011 after defendant surrendered her parental rights. The older child, born in September 2004, was in the custody of her biological father by court order under the Family Part's non-dissolution ("FD") docket. Each of defendant's three children has a different father. Defendant also had a history of involvement with the Division as a child herself as a result of being sexually abused by her father.

A-0328-17T3

As a result, the Division was granted care, custody, and supervision of A.W.C., Jr., pursuant to N.J.S.A. 9:6-8.21 and 30:4C-12, and placed him with his paternal grandparents where he has remained since.

At the trial, caseworkers Jane Siegmund and Heather Delapa testified about the Division's involvement with defendant, and Alan Lee, Psy. D., the Division's expert in the field of forensic psychology, testified about the psychological and bonding evaluations he conducted at the Division's request. A.W.C., Jr.'s paternal grandmother also testified for the Division about her and her husband's commitment to adopting their grandson.

For the defense, defendant testified on her own behalf, objecting to the termination of her parental rights. Defendant produced as witnesses Jeanine Schmidt and Laurie Vincent, the Director and Certified Associate Addiction Counselor, respectively, at Hogar Crea Women's Center (Hogar), the residential treatment facility defendant was attending at the time of the trial, to vouch for her progress in treatment since her admission in November 2016 and her negative drug screens while at the program. Defendant's mother also testified on her behalf, acknowledging that defendant "was on a downward spiral" prior to entering Hogar, confirming how well defendant had done at Hogar, and describing the close relationship defendant had with her son.

Andrew Brown, Ph. D., an expert in the field of psychology, testified for defendant about the psychological and bonding evaluations he conducted and his disagreements with the Division's expert.

Siegmund and Delapa detailed the Division's involvement with defendant since its inception. Siegmund testified that while defendant resided at the paternal grandparents' home, she was unemployed, paid no rent and received social security disability. After she was ejected from their home in March of 2014, she was homeless and had no contact with the Division or her son for several months. Once defendant resumed contact with the Division in October 2014, she received numerous substance abuse evaluations, random urine screens, referrals to inpatient and outpatient substance abuse programs, medication monitoring, and psychiatric treatment. However, according to Siegmund, although "[t]here were times where [defendant] was consistent[,]" the "majority of the time she was inconsistent" with both substance abuse and mental health treatment, consistently tested positive for illicit substances, and failed to complete the programs. Delapa testified that defendant was also "inconsistent with taking [her] medication[s]" and reported that as recent as March of 2016, defendant had a psychotic episode during which "she was on the

A-0328-17T3

front lawn of her mother's house . . . threatening to commit suicide."

As to visitation, although the Division arranged for supervised visitation, Delapa confirmed that there was no visitation during the "periods of time that [defendant] was missing." When she reappeared, her visits were "sporadic" and "there were concerns about her sleeping" during visits. Once it became apparent that defendant's intermittent disengagements and failure to comply with treatment prevented her from maintaining sobriety and mental health long term, the Division's goal changed from reunification to kinship legal guardianship (KLG) and ultimately adoption by the paternal grandparents. Despite the court relieving the Division of its obligation to make reasonable efforts on September 19, 2016, the Division continued to offer visitation, mental health services, and substance abuse treatment, and attempted to locate defendant whenever she was missing.

In January of 2017, the Division located defendant at Hogar, an unlicensed residential substance abuse program in Pennsylvania that defendant found "on her own." According to witness accounts, the program lasted eighteen to twenty-two months with follow-up aftercare. The therapeutic component of the program consisted of long-term residents and program graduates counseling new residents. Residents were transported to an outside professional

facility for psychological and psychiatric treatment as needed. In defendant's case, she had four visits to a psychiatrist during her nine-and-a-half months at Hogar. Delapa learned from the program director that they were willing to change the program guidelines to allow an early discharge for defendant given the ongoing termination proceedings. Once the Division located defendant at Hogar, it reinstated regular supervised visitation, alternating transporting A.W.C., Jr. to Pennsylvania to visit defendant between the Division and the maternal grandmother.

A.W.C., Jr.'s paternal grandmother testified for the Division and confirmed that she and her husband were committed to adopting their grandson. She indicated that although they initially considered KLG, they decided against it because A.W.C., Jr. needed "stability." She described her grandson as "very verbal" and "highly intelligent" but acknowledged that "[h]e has special needs," including an eye condition for which he underwent surgery and "core problems" for which he received therapy. Nonetheless, she was confident that she and her husband would be able to meet his needs. She also confirmed that they were willing to facilitate continued contact with A.W.C., Jr.'s maternal relatives, including his half-brother and defendant, as long as defendant's mother supervised the contact, because she believed "kids need to know their parents[.]" During their testimony, defendant and her mother

contradicted the paternal grandmother's testimony in this regard and expressed their belief that they would not have access to A.W.C., Jr. if defendant's parental rights were terminated and he was adopted by his paternal grandparents. However, defendant's mother acknowledged that on one occasion when the paternal grandmother objected to A.W.C., Jr. visiting defendant, it was based on her concern that A.W.C., Jr. would be exposed to one of defendant's boyfriends who had a drinking problem. According to defendant, she severed all ties with that boyfriend as a result.

After conducting a psychological evaluation of defendant as well as bonding evaluations with defendant and each of A.W.C., Jr.'s paternal grandparents on March 29, 2017, Dr. Lee concluded that "[defendant] would not be able to provide a minimally adequate level of parenting to [A.W.C., Jr.]" now and within the foreseeable future. Dr. Lee's conclusion was based on defendant's "mental health issues," "maladaptive personality and [character] traits[,]" "substance abuse risk," "instability in . . . multiple areas of her life[,]" and "lack of parenting knowledge and parenting experience." Dr. Lee noted that these issues persisted years after A.W.C., Jr. was removed and defendant was provided with different services. According to Dr. Lee, even defendant attributed her plight to her doing "too little too late." Further, defendant herself acknowledged that after completing Hogar,

A.W.C., Jr. would still have to remain with his paternal grandparents until she was able to pursue vocational training, secure employment, obtain suitable housing and "get on her own two feet again."

Dr. Lee diagnosed defendant with personality disorder NOS with borderline dependent and narcissistic traits, as well as depressive disorder, anxiety disorder, post-traumatic stress disorder, and polysubstance use disorder. He did not, however, "find compelling evidence . . . that she has bipolar disorder per se." Although Dr. Lee did not find any "gross deficits in her intellectual functioning[,]" he determined that defendant was "psychologically less mature than most adults[,]" "has difficulties with coping and problem-solving," "tends to be impulsive" and "reckless and [has] difficulty sustaining consistency in her life and lifestyle." Dr. Lee pointed to defendant's history of "unstable residence, unstable relationships [and] unstable employment" as well as her limited knowledge of parenting and child rearing after having three children. Given a four-year-old child's need for "consistency[,]" "stability[,]" "protection and guidance[,]" Dr. Lee concluded that defendant "would face and exhibit significant problems to be a minimally adequate parent" to A.W.C., Jr. He also stressed that because defendant's substance abuse occurred over time and subsequent to

completing some substance abuse programs, there was a "heightened risk for substance abuse relapse."

As to the bonding evaluations, Dr. Lee described A.W.C., Jr.'s attachment to defendant "as being ambivalent and insecure." Because Dr. Lee did not consider the attachment "to be a significant and positive bond," he concluded that there was "a low risk of [A.W.C., Jr.] suffering severe and enduring harm if his relationship with [defendant] [was] permanently ended." On the other hand, Dr. Lee described A.W.C., Jr.'s attachment to each paternal grandparent "as a significant and positive bond." As a result, according to Dr. Lee, "there [was] a significant risk of [A.W.C., Jr.] suffering severe and enduring harm if this relationship . . . [was] permanently ended." Further, Dr. Lee opined that while it was "likely that the paternal grandparents would be able to mitigate any possible harm" from terminating defendant's parental rights, defendant would not be able to "mitigate the harm that [A.W.C., Jr.] would be expected to have by leaving the paternal grandparents."

The defense expert disagreed with most of Dr. Lee's conclusions. After conducting a psychological and bonding evaluation of defendant on July 18, 2017, as well as bonding evaluations with A.W.C., Jr.'s paternal grandparents on July 11, 2017, Dr. Brown agreed that defendant was not currently capable

of being a minimally adequate parent for her son. However, he opined that assuming defendant completed Hogar, continued to receive counseling and psychotherapy, and remained compliant with her psychiatric care and psychotropic medication regimen, she "could in the near future" be a minimally adequate parent for her son. Although Dr. Brown could not determine how long it would take for defendant to be able to provide full time care for her son, he recommended "a reevaluation at some point to determine her current emotional and behavioral status."

Dr. Brown also found that A.W.C., Jr. viewed his paternal grandparents as his psychological parents but did not make a similar finding for defendant. Nonetheless, he opined that while A.W.C., Jr. "show[ed] a secure attachment" to both defendant and his paternal grandparents, if defendant's parental rights were terminated and A.W.C., Jr. was adopted by his paternal grandparents, "[A.W.C., Jr.] runs the risk of experiencing psychological injury" that his paternal grandparents "would not be able to mitigate." On the other hand, according to Dr. Brown, although A.W.C., Jr. would suffer harm if he was removed from his paternal grandparents, defendant was capable of mitigating that harm. Dr. Brown's conclusion that termination of defendant's parental rights would pose "a threat to [A.W.C., Jr.'s] development" and "do more harm than benefit" was premised on his

12

belief that while defendant recognized the importance of A.W.C., Jr. having an ongoing relationship with his paternal grandparents, his paternal grandparents did not recognize the importance of A.W.C., Jr. having an ongoing relationship with his mother.

Following the trial, on September 5, 2017, Judge Bernstein issued an oral decision in which he determined the Division had proven, "by clear and convincing evidence," "all four prongs" of the best interests standard. The judge described defendant's progress at Hogar "for the last nine-and-a-half months" as "commendable." He acknowledged that, by all accounts, defendant had "been able to remain drug-free and abstinent" while at Hogar, and "had good intentions throughout this case" as evidenced by her involvement in several programs and completing "some of the programs."

However, because defendant had relapsed in the past and become non-compliant with "her mental health issues" after completing programs, the judge determined she had an unknown and unpredictable future. The judge noted that, "despite all the Division involvement and all the services being offered[,] . . . she [had] never really addressed completely her mental health and drug addiction issues." The judge agreed with Dr. Lee that defendant had "never really addressed the issues that [had] plagued her since childhood" and found it significant that defendant was not

13

being honest about her issues during Dr. Lee's evaluation of her. As a result, the judge found that defendant had "not alleviated the harm . . . that prevented her from caring for [her son] . . . and which continued to make . . . her incapable of caring for" him, despite the Division's "reasonable efforts."

The judge recounted defendant's lengthy history of involvement with the Division "going back five or six years" before A.W.C., Jr. was born. He detailed defendant's mental health history, including her diagnosis for "PTSD and bipolar disorder[,]" her "several suicide attempts," and her "periods of depression," and concluded that the peer counseling and four visits to the psychiatrist while attending Hogar could not "seriously address[] those issues." The judge noted that both experts testified that defendant needed intensive psychotherapy and psychotropic medications to treat her disorders, which are "conditions that can be extremely hard to treat." Further, the judge was concerned that defendant would be discharged from Hogar "without any plans" concerning where she was "going to live," how she was "going to survive financially," what education program to pursue, "how she would care for her child, [or] what [she was] going to do with her own life."

The judge noted that despite her "progress in the last nine-and-a-half months" at Hogar, defendant had not had "the same

14

stressors that appear when you are out on your own" and which defendant had "never been able to address" for herself." Further, according to the judge, either when A.W.C., Jr. "was in her custody" or "in the last three-and-a-half years that he's been out of her custody[,]" defendant had never demonstrated "that [A.W.C., Jr.] could rely upon her" for "food, clothing, shelter, [and] medical [care]" or "[t]o take care of him when he's crying and in need." Indeed, according to the judge, even her own expert admitted that defendant was "not capable of parenting at this particular time" and suggested reevaluating in six months.

In evaluating the divergent expert testimony, the judge rejected Dr. Brown's testimony as illogical and unbelievable, and found Dr. Lee's testimony "credible and believable based on the history of this case and all the facts that have taken place." As to Dr. Brown's opinion of defendant's ability to parent in the future, the judge did not find it believable "to any type of degree of psychological certainty" because it was "speculative" and purely "hopeful wishing."

Regarding the bonding evaluations, the judge credited Dr. Lee's opinion "that there [was] an insecure bond" between defendant and A.W.C., Jr. He disputed Dr. Brown's finding of "a secure bond" between defendant and her son based on them living "together [until] he was a year and three or four months old," given the

fact that defendant disappeared and abandoned her son "for six, eight months at a time." The judge found it incredible that "disappearing from [the life of] a child does not dissipate . . . any bond that could have occurred." Equally implausible to the judge was Dr. Brown's opinion that defendant and the paternal grandparents had "the same bond" when defendant only visited with her son over three-and-a-half years "compared to the time spent and the care that's given by the paternal grandparents on a day-to-day basis twenty-four/seven."

Further, the judge rejected Dr. Brown's opinion that defendant was "capable of dissipating the harm that would [be] cause[d] by taking [A.W.C., Jr.] away from the . . . paternal grandparents . . . who have cared for him" since "he was a year and three or four months old." Likewise, the judge found Dr. Brown's opinion that the paternal grandparents could not "dissipate the potential harm" caused by termination of defendant's parental rights "totally illogical," particularly since Dr. Brown admitted that the paternal grandparents were, in fact, A.W.C., Jr.'s "psychological parents" and that their home was the only one he had known.

In this regard, the judge concluded that the paternal grandparents "clearly love him, take care of him, have seen to all his needs," and could mitigate "any harm that could be caused by

16

termination of parental rights." Moreover, the judge believed the paternal grandmother that "she would allow [defendant] to continue to maintain a relationship, probably through the [maternal] grandmother." The judge concluded that A.W.C., Jr. "is growing up and needs stability, needs permanency," and KLG was "not available in this case" because the paternal grandparents were "committed to adoption." The judge entered a memorializing order, and this appeal followed.

Our scope of review on appeals from orders terminating parental rights is limited. In such cases, we will generally uphold the trial court's findings, so long as they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). Such a decision should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We must give substantial deference to the family court judge's special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. R.G., 217 N.J. at 552-53. Contrary to defendant's contention, as the fact finder, a "trial judge is 'not required to accept all or any part of [an] expert opinion[].'" In re Civil Commitment of

<u>R.F.</u>, 217 N.J. 152, 174 (2014) (alteration in original) (quoting <u>In re D.C.</u>, 146 N.J. 31, 61 (1996)). Even where, as here, the appellant alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 N.J. 261, 279 (2007) (first quoting <u>In re Guardianship of J.T.</u>, 269 N.J. Super. 172, 188-89 (App. Div. 1993); then quoting <u>C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc.</u>, 233 N.J. Super. 65, 69 (App. Div. 1989)).

Guided by these standards, we conclude that Judge Bernstein's factual findings are amply supported by the credible evidence in the record, and his legal conclusions are unassailable. "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420, 448-49 (2012). The judge reviewed the evidence presented at trial, made detailed findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met by clear and convincing evidence all of the legal requirements for a judgment of guardianship. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and accords with applicable

18

case law. <u>See, e.g.</u>, <u>F.M.</u>, 211 N.J. at 447-54; <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 103-07 (2008); <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 347-63 (1999); <u>In re Guardianship of D.M.H.</u>, 161 N.J. 365, 375-93 (1999). We thus affirm substantially for the reasons Judge Bernstein expressed in his well-reasoned oral opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-0328-17T3